FILED by ___ D.C.
ELECTRONIC

**May 28, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.

**09-80803-Civ-MARRA/JOHNSON**

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    vs.

WILLIAM BETTA, JR., TRAVIS A.
BRANCH, JAMES J. CAPRIO, TROY L.
GAGLIARDI, RUSSELL M. KAUTZ,
BARRY M. KORNFELD, SHANE A.
MCCANN, CLIFFORD A. POPPER,
ALFRED B. RUBIN, and STEVEN I.
SHRAGO,

        Defendants.

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.    The Commission brings this action to restrain and permanently enjoin William

Betta, Jr., Travis A. Branch, James J. Caprio, Troy L. Gagliardi, Russell M. Kautz, Barry M.

Kornfeld, Shane A. McCann, Clifford A. Popper, Alfred B. Rubin, and Steven I. Shrago

(collectively, "Defendants") from violating the antifraud provisions of the federal securities laws.

2.    Between 2004 and 2007, Defendants, formerly registered representatives at

Brookstreet Securities Corp. ("Brookstreet"), made false and misleading statements in

connection with the offer, sale, or purchase of certain types of Collateralized Mortgage

Obligations ("CMOs"). Defendants told their customers that the CMOs in which they would

invest were safe, secure, liquid investments that were suitable for retirees, retirement accounts,

and investors with conservative investment goals. Contrary to what they told customers,

between 2004 and 2007 Defendants invested in risky types of CMOs that: (1) were not all

guaranteed by the United States government; (2) jeopardized customers' yield and principal;

(3) were largely illiquid; and (4) were only suitable for sophisticated investors with a high-risk

investment profile. In addition, Defendants heavily margined customers' accounts (up to a ten to one margin to equity ratio), making the CMOs in which they invested even more sensitive to changes in interest rates and downturns in the CMO market.

3.     Defendants' fraudulent misrepresentations and omissions attracted more than 750 investor accounts with CMO investments of more than $175 million.

4.     Beginning in early 2007, the CMO market began to fail, resulting in significant losses for Defendants' customers and margin calls for those customers on margin. By June 2007, the margin calls had snowballed to the point where Brookstreet failed to meet its net capital requirements, causing the company to cease operations. Many of Defendants' CMO customers lost their savings, their homes, and/or their ability to retire or stay retired. In addition, many margined CMO customers ended up owing Brookstreet's clearing firm hundreds of thousands of dollars.

5.     By engaging in the conduct described in this Complaint, Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Unless enjoined, Defendants are likely to commit such violations in the future.

6.     The Commission seeks a judgment from the Court: (a) enjoining Defendants from engaging, directly or indirectly, in further violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) ordering Defendants to disgorge, with prejudgment interest, the amount by which they were unjustly enriched as a result of their violations of the federal securities laws; and (c) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## DEFENDANTS

7.     **William Betta, Jr.**, age 36, resides in Boca Raton, Florida. Between May 2004 and June 2007, Betta was a registered representative in Brookstreet's Boca Raton office and was the "broker liaison" for the office. He holds Series 7 and 63 securities licenses. Betta is

- 2 -

currently a registered representative with Workman Securities Corp., a registered broker-dealer and investment adviser.

8. **Travis A. Branch**, age 54, resides in Kailua, Hawaii. Branch was a registered representative in Brookstreet's Honolulu office from February 1995 to June 2007. He holds Series 6, 7, 22, 24, and 63 securities licenses. Branch currently sells insurance and performs tax consulting through his private company.

9. **James J. Caprio**, age 46, resides in Weston, Florida. Caprio was branch manager in Brookstreet's Boca Raton office from January 2004 to November 2005, and a registered representative in that office from January 2004 to January 2006. He holds Series 4, 7, 24, 63, and 65 securities licenses. In 2006, Caprio was enjoined from future violations of Sections 5(a) and 5(c) of the Securities Act and Section 13(d) of the Exchange Act, and Rules 13d-1 and 13d-2 thereunder, for selling unregistered securities and failing to file a Schedule 13D report after obtaining more than 5% of a public company. *In re Caprio*, Rel. No. 34-53178 (Jan. 25, 2006). Caprio paid a $125,000 civil penalty and was suspended from associating with a broker-dealer for six months. *Id.* Caprio currently works as a commercial real-estate broker.

10. **Troy L. Gagliardi**, age 37, resides in Boca Raton, Florida. Gagliardi was branch manager of Brookstreet's Boca Raton office from March 2006 to June 2007, and a registered representative in Brookstreet's Jericho, Deer Park, and Boca Raton offices from August 1999 to June 2007. He holds Series 4, 7, 24, 63, 65, and 66 securities licenses. Gagliardi is currently a registered representative with Newbridge Securities Corp., a registered broker-dealer, and an investment adviser representative with Newbridge Financial Services Group, Inc., a registered investment adviser.

11. **Russell M. Kautz**, age 51, resides in Medford, Oregon. Kautz was a registered representative in Brookstreet's Medford office from January 2003 through June 2007. He holds Series 7, 24, 31, 63, and 65 securities licenses. Kautz is currently a registered representative and investment adviser with Wedbush Morgan Securities Inc., a registered broker-dealer and investment adviser.

12.    **Barry M. Kornfeld**, age 46, resides in Parkland, Florida. Kornfeld was a registered representative at Brookstreet's Coral Springs office from January 2004 to June 2007, and a branch manager in that office from January 2004 to June 2006. He holds Series 4, 7, 24, 31, 63, and 66 securities licenses. Kornfeld is currently a commercial real-estate broker.

13.    **Shane A. McCann**, age 41, resides in Florence, Montana. McCann was a registered representative in Brookstreet's Missoula office from June 2002 to June 2007. He holds Series 6, 7, and 63 securities licenses. McCann is currently a registered representative at Pacific West Securities, Inc., a registered broker-dealer and investment adviser.

14.    **Clifford A. Popper,** age 51, resides in Highland Beach, Florida. Popper was a registered representative in Brookstreet's Boca Raton office from January 2004 to June 2007. He holds Series 7 and 63 securities licenses. Popper is currently unemployed.

15.    **Alfred B. Rubin**, age 55, resides in Pompano Beach, Florida. Rubin was a registered representative in Brookstreet's Coral Springs office from January 2004 to June 2007, and a branch manager in that office from June 2006 to June 2007. He holds Series 6, 7, 24, 63, and 66 securities licenses. Rubin is currently unemployed.

16.    **Steven I. Shrago**, age 49, resides in St. Petersburg, Florida. Shrago was a registered representative in Brookstreet's St. Petersburg office from January 2001 to June 2007. He holds Series 3, 7, 24, 53, 63, and 65 securities licenses. Shrago is currently a registered representative and an investment adviser representative with Wedbush Morgan Securities Inc., a registered broker-dealer and investment adviser.

**OTHER RELEVANT ENTITY**

17.    **Brookstreet Securities Corp.** was a California corporation headquartered in Irvine, California, and was a dually registered broker-dealer and investment adviser. Brookstreet was controlled by Stanley C. Brooks and the Brooks Family Trust. Brookstreet operated numerous independent offices nationwide, including Defendants' offices. From at least January 2004 through June 2007, Brookstreet had an agreement with a clearing broker-dealer to execute all of Brookstreet's securities transactions and maintain its customer accounts. In June 2007, Brookstreet failed to meet its net capital requirements and ceased operations.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e),

and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  Defendants, directly or

indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or

of the facilities of a national securities exchange, in or in connection with the transactions, acts,

practices, and courses of business alleged in this Complaint.

19.     Venue is proper in the Southern District of Florida pursuant to Section 22(a) of

the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa,

because certain of the transactions, acts, practices, and courses of business constituting violations

of the federal securities laws occurred within this district.  In addition, Betta, Caprio, Gagliardi,

Kornfeld, Popper, and Rubin resided in this district during the events described in this

Complaint.

## THE FRAUDULENT SCHEME

### A.     The CMO Program

20.     From January 2004 to June 2007, Brookstreet sponsored the CMO Program,

which allowed Defendants to invest their customers' funds in CMOs.  In recommending CMOs

and the CMO Program to customers, Defendants made material misrepresentations and

omissions.

21.     A CMO is a security that is collateralized by mortgage-backed securities

("MBS"), which in turn are undivided interests in a pool of mortgages.  The principal and

interest from the mortgages underlying a MBS are used to pay CMO investors principal and/or

interest, depending on the type, or "tranche," of CMO that they own.  CMOs are classified, in

part, based on the entity that guarantees them.  CMOs guaranteed by Ginnie Mae, a government

agency, carry no credit risk.  During the relevant period, CMOs guaranteed by Fannie Mae or

Freddie Mac, both government-sponsored entities ("GSEs"), carried some credit risk because

they were not backed by the full faith and credit of the United States government.  CMOs

guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac are referred to as "agency" CMOs.

"Non-agency" CMOs are guaranteed solely by private institutions and carry the credit risk associated with those private institutions.

22.     The self-described "Institutional Bond Group," located in Brookstreet's Boca Raton office, controlled the CMO Program. Popper managed and directed the Institutional Bond Group. Caprio, Gagliardi, and Betta worked in the Institutional Bond Group as its staff and as registered representatives for their own customers. The Institutional Bond Group was the conduit through which all CMO trades occurred at Brookstreet. Defendants could only trade CMOs in and out of their customers' accounts by funneling trades through the Institutional Bond Group.

23.     The Institutional Bond Group used seminars at Brookstreet's annual product marketing conferences, internal email distributions, and conference calls to solicit registered representatives located at other Brookstreet offices, including Branch, Kautz, Kornfeld, McCann, Rubin, and Shrago, to participate in the CMO Program.

24.     Those Brookstreet registered representatives who wanted to participate in the CMO Program contacted the Institutional Bond Group to have their customers' accounts "designated for management." Only Popper, Caprio, Gagliardi, and Betta were part of the Institutional Bond Group, but Branch, Kautz, Kornfeld, McCann, Rubin, and Shrago participated in the CMO Program.

25.     Popper was the director of the Institutional Bond Group and the architect of the CMO Program: he selected CMOs for purchase or sale; traded them with traders at other institutions; and made CMO recommendations to Brookstreet customers through their registered representatives. Popper styled himself as a CMO expert and positioned himself as the "Portfolio Manager" for the CMO Program. In addition, Popper was a registered representative for sixty-eight of his own CMO Program customer accounts.

26.     Betta was the Institutional Bond Group's "broker liaison," and he communicated with other Brookstreet registered representatives on Popper's behalf. Betta's primary role as broker liaison was to convey Popper's CMO trade recommendations to registered representatives. Betta also educated other registered representatives on CMOs. Betta had only a

- 6 -

few of his own CMO Program customer accounts, but he spoke directly with other registered representatives' customers and made representations to them about the characteristics of CMOs.

27.    Caprio (January 2004 to November 2005) and Gagliardi (March 2006 to June 2007) served as the supervisors for Brookstreet's Boca Raton office, which housed the Institutional Bond Group. In addition to their supervisory roles within the office, Caprio and Gagliardi were registered representatives with 125 and 31 CMO Program customer accounts, respectively.

28.    Branch, Kautz, Kornfeld, McCann, Rubin, and Shrago participated in the CMO Program as registered representatives and recommended CMOs to their customers. Branch had 32 CMO Program customer accounts, Kautz had 13, Kornfeld had 228, McCann had 17, Rubin had 232, and Shrago had 27.

**B.    The Types of CMOs Traded in the CMO Program**

29.    CMOs come in myriad varieties, each with its own yield, price volatility, and risk characteristics. However, the vast majority of CMOs traded in the CMO Program were risky and sensitive to changes in market interest rates.

30.    Approximately 90% of all CMO purchases (weighted by price and volume) at Brookstreet between January 2004 and June 2007 were inverse floating rate CMOs ("Inverse Floaters"), interest only CMOs ("IOs"), and inverse interest only CMOs ("Inverse IOs"). Among these three types of CMOs (hereinafter referred to as "Program CMOs"), 86% were agency CMOs and 14% were non-agency CMOs.

31.    Inverse Floaters are variable rate securities with a coupon that is inversely related to a short-term interest rate index, typically the London Interbank Offered Rate ("LIBOR"). As the index's interest rates rise, the Inverse Floater's interest payment falls, and vice versa. Inverse Floaters can have poor liquidity and erratic pricing. Inverse Floaters purchased for a premium (i.e., at a price over par) or sold before maturity present price risk to investors (i.e., the investor can lose their original investment).

32.    IOs are risky securities because they have no principal component and pay investors solely from the interest payments on the mortgage pool underlying a MBS. IOs are

- 7 -

sensitive to market interest rate changes. When market interest rates fall, homeowners tend to prepay their loans, thereby reducing the number of mortgages available in the underlying pool to make interest payments. If enough mortgages underlying an IO prepay, the entire tranche may "expire" early, resulting in a loss for investors who had not already recouped their initial investment through the interest payments.

33.     Inverse IOs are a hybrid of Inverse Floaters and IOs. Like IOs, Inverse IOs have no principal component and investors are paid solely from the underlying MBS' interest payments. Like Inverse Floaters, the interest payment for Inverse IOs moves in the opposite direction of a specific short-term interest rate index. In all but limited interest rate environments (e.g., falling short-term interest rates, but neutral or rising long-term interest rates), Inverse IOs display the negative characteristics of both Inverse Floaters and IOs; their price is sensitive to changes in the market interest rate and investors risk losing their investment.

34.     These three types of CMOs are among the riskiest available and are generally not suitable for retail investors. Accordingly, in 1993, the NASD issued *Notice to Members 93-73: Member's Obligations to Customers When Selling Collateralized Mortgage Obligations (CMOs)* ("*NASD Notice 93-73*"), which stated that Inverse Floaters are "only suitable for sophisticated investors with a high-risk profile," and dictated that members could sell IOs "only to sophisticated investors maintaining a high-risk profile."

## C.    The CMO Trading Process

35.     The Institutional Bond Group conducted CMO trades on behalf of all CMO Program customers. Popper selected each CMO that was traded within the CMO Program. The Institutional Bond Group communicated Popper's CMO selections and proposed CMO trades to the registered representatives, including Defendants, who signed trade tickets to confirm that their customers approved the trade.

36.     Popper typically traded institutional-sized blocks (i.e., "round lots") of CMOs. After a CMO purchase, the Institutional Bond Group broke these round lots into smaller, "odd lot" positions for distribution into customers' accounts. Prior to a sale, the Institutional Bond Group would aggregate customers' odd lot CMO positions into round lots, which were more

- 8 -

easily sold into the market.

37.     CMO Program customers sometimes requested that Defendants sell their CMO positions outside of Popper's standard sale process. These customers faced liquidity problems and delays of up to one year due to the fact that they typically held odd lot positions. As a result, customers either had to cross-trade with other Brookstreet customers or wait until Popper decided to aggregate their CMOs with other customers' positions to sell a round lot to the market.

38.     None of the Defendants had actual discretionary authority over their customers' accounts. In practice, however, Defendants had complete control over customers' CMO trades; Defendants did not always seek authorization from customers before executing a CMO trade, and customers generally relied upon Defendants' "expertise" to manage their accounts because they did not understand Program CMOs.

39.     Defendants heavily leveraged the accounts of CMO Program customers who agreed to use margin. In June 2006, after Brookstreet's clearing firm relaxed its house margin requirements for Inverse Floaters and IOs, Defendants began leveraging their customers' CMO Program accounts up to 90% (e.g., an account with $100,000 in equity would be able to purchase $1,000,000 of CMOs).

40.     Defendants received commissions on the CMO trades (see Table below). Betta also received a salary of $2.3 million over four years for his role as the CMO Bond Group's broker liaison.

| Defendants' CMO Accounts, Use of Margin, and Commissions: 2004 – 2007 | | | | | |
|---|---|---|---|---|---|
| Defendant | CMO Accounts | Margin Accounts | Accounts in Deficit | Total Amount of Deficits | CMO Commissions |
| William Betta, Jr. | 2 | 0 | 0 | $0 | $21,318 |
| Travis A. Branch | 32 | 21 | 16 | $3,202,035 | $481,895 |
| James J. Caprio | 125 | 77 | 4 | $143,487 | $956,636 |
| Troy L. Gagliardi | 31 | 16 | 11 | $12,102,581 | $3,388,645 |
| Russell M. Kautz | 13 | 6 | 5 | $1,840,038 | $344,770 |

| Barry M. Kornfeld | 228 | 46 | 25 | $5,313,790 | $2,363,729 |
|---|---|---|---|---|---|
| Shane A. McCann | 17 | 4 | 3 | $1,061,444 | $407,748 |
| Clifford A. Popper | 68 | 30 | 12 | $10,925,123 | $6,827,714 |
| Alfred B. Rubin | 232 | 44 | 23 | $4,963,830 | $1,259,843 |
| Steven I. Shrago | 27 | 5 | 2 | $201,221 | $186,607 |
| *Totals* | *775* | *249* | *101* | *$39,753,549* | *$16,238,905* |

**D.**   **Material Misrepresentations and Omissions**

41.     Defendants made material misrepresentations and/or failed to disclose material information to prospective and established customers about Program CMOs and the CMO Program.

42.     Some Defendants misrepresented to customers that Program CMOs were backed by the United States government.  For example:

- **Betta**.  In December 2003 and June 2004, in Boca Raton, Florida, Betta represented to customers that Program CMOs were guaranteed by the federal government.  Betta also called Program CMOs "government bonds."

- **Branch**.  In February and May 2005, and October 2006, in Honolulu, Hawaii, Branch represented to customers that Program CMOs were guaranteed by the federal government.

- **Caprio**.  In late 2004, in Boca Raton, Florida, Caprio represented to a customer that Program CMOs were issued by government or quasi-government agencies.  In December 2003, in Boca Raton, Florida, Caprio represented to a customer that Program CMOs were backed by the United States government.

- **Gagliardi**.  In April 2004, on a telephone call with a customer located in England, Gagliardi represented that Program CMOs were backed by the United States Government.  In September 2004, in New York, Gagliardi represented to a customer that Program CMOs were "government backed

- 10 -

mortgage bonds." In November 2004, in New York, Gagliardi represented to a customer that Program CMOs were "government guaranteed" and referred to them as "government bonds."

- **Kautz**. In May and September 2005, in Medford, Oregon, Kautz represented to customers that Program CMOs were guaranteed by the federal government and that they were "government-backed AAA-rated bonds."

- **Kornfeld**. In 2003 and 2005, in Coral Springs, Florida, Kornfeld represented to customers that Program CMOs were guaranteed by the federal government. In June 2005, in Coral Springs, Florida, Kornfeld told a customer that Program CMOs were "AAA government bonds."

- **Popper**. In June 2007, Popper represented to a customer that the principal and interest for Program CMOs were guaranteed by government agencies. In 2000, 2001, and 2003, in Boca Raton, Florida, Popper represented to customers that Program CMOs were backed by the United States government.

- **Rubin**. In July 2004 and January 2006, in Coral Springs, Florida, Rubin represented to customers that Program CMOs were backed by the United States government.

- **Shrago**. In December 2004, in St. Petersburg, Florida, Shrago represented to a customer that Program CMOs were government backed. Shrago also called Program CMOs "government bonds."

In fact, from at least 2004 to 2007, Defendants invested CMO Program customers' funds in both agency and non-agency CMOs. During the relevant period, only Ginnie Mae CMOs carried a government guarantee.

43. Defendants misrepresented to customers that Program CMOs presented low or no risk to principal. For example:

- **Betta**. In October and December 2003, and June 2004, in Boca Raton, Florida, Betta represented to customers that Program CMOs presented no risk to principal and/or could not lose principal. In October and December 2003,

Betta represented to customers that the worst thing that could happen with
Program CMOs is that the customers would have to wait until they matured to
get their entire principal back.

- **Branch**. In February 2005, in Honolulu, Hawaii, Branch represented to
  customers that the safety of principal was guaranteed with Program CMOs.

- **Caprio**. In October and December 2003, and February 2004, in Boca Raton,
  Florida, Caprio represented to customers that Program CMOs presented no
  risk to principal and/or could not lose principal. In October and December
  2003, Caprio represented to customers that the worst thing that could happen
  with Program CMOs is that the customers would have to wait until their
  investment matured to get their entire principal back.

- **Gagliardi**. In September 2004, in New York, Gagliardi represented to a
  customer that Program CMOs could not lose principal unless the United
  States economy failed. In April 2004, in New York, Gagliardi represented to
  a customer that Program CMOs protected principal.

- **Kautz**. In May and September 2005, and January 2006, in Medford, Oregon,
  Kautz represented to customers that Program CMOs presented low or no risk
  to principal.

- **Kornfeld**. In 2003 and 2005, in Coral Springs, Florida, Kornfeld represented
  to customers that Program CMOs had no risk to principal and/or were
  completely safe.

- **McCann**. In August 2004 and June 2005, in Missoula, Montana, McCann
  represented to customers that Program CMOs were safe and AAA-rated.

- **Popper**. In 2004, in Boca Raton, Florida, Popper represented to a customer
  that CMOs were a low risk, safe investment. In 2001 and October and
  December 2003, in Boca Raton, Florida, Popper represented to customers that
  Program CMOs presented no risk to principal and could not lose principal. In
  October and December 2003, Popper represented to customers that the worst

- 12 -

thing that could happen with Program CMOs is that the customers would have to wait until they matured to get their entire principal back.

- **Rubin**. In 2003, 2004, and 2006, in Coral Springs, Florida, Rubin represented to customers that Program CMOs had little to no risk to principal.

- **Shrago**. In November 2003, in St. Petersburg, Florida, Shrago represented to a customer that Program CMOs were safe and as secure as certificates of deposit.

In fact, from at least 2004 to 2007, Defendants knew, or were severely reckless in not knowing, that changes in interest rates and/or prepayment speeds could result in large fluctuations in Program CMO prices and a loss of principal for IOs or any Inverse Floaters that customers bought at a premium or sold prior to maturity.

44.     Some Defendants misrepresented to customers that Program CMOs were easily sold and/or could be liquidated within thirty to ninety days. For example:

- **Betta**. In October 2003, in Boca Raton, Florida, Betta represented to a customer that Program CMOs could be easily sold within thirty days, but failed to disclose that Program CMOs were not liquid because they were exotic tranches of CMOs and because the customer would hold odd lot positions.

- **Caprio**. In October 2003 and February 2004, in Boca Raton, Florida, Caprio represented to customers that Program CMOs could be easily sold upon request or within thirty days, but failed to disclose that Program CMOs were less liquid because they were exotic tranches of CMOs and because the customer would hold odd lot positions.

- **Gagliardi**. In April and September 2004, in New York, Gagliardi represented to customers that Program CMOs were easily traded and could be sold at any time.

- **Kautz**. In May and September 2005, in Medford, Oregon, Kautz represented to customers that Program CMOs were liquid investments.

- **Kornfeld**. In 2003, in Coral Springs, Florida, Kornfeld represented to a customer that Program CMOs could be sold quickly. In October 2006, in Coral Springs, Florida, Kornfeld represented to customers that he would liquidate their Program CMO account immediately, but he did not do so for several months.

- **McCann**. In August 2004, in Missoula, Montana, McCann represented to a customer that the CMO Program distributed odd lots of Program CMOs to customers' accounts, but failed to disclose that this made Program CMOs less liquid.

- **Popper**. In 2001, in Boca Raton, Florida, Popper told a customer that Program CMOs were liquid because there was a huge market for them. In October 2003, in Boca Raton, Florida, Popper represented to a customer that Program CMOs could be easily sold within thirty days, but failed to disclose that Program CMOs were less liquid because they were exotic tranches of CMOs and because the customer would hold odd lot positions.

- **Rubin**. In July 2004, in Coral Springs, Florida, Rubin represented to a customer that Program CMOs were easily traded. In January 2006, in Coral Springs, Florida, Rubin represented to a customer that Program CMOs could be liquidated within a month. In October 2006, in Coral Springs, Florida, Rubin represented to customers that he would liquidate their Program CMO account immediately, but did not do so for several months.

- **Shrago**. In November 2003, in St. Petersburg, Florida, Shrago represented to a customer that Program CMOs could be sold with 24 hours' notice and that an entire account could be liquidated within sixty days.

In fact, from at least 2004 to 2007, Defendants knew, or were severely reckless in not knowing, that Program CMOs were largely illiquid because they were exotic tranches of CMOs and because customers held them in odd lot, rather than round lot, positions. Many customers waited more than three months, and some more than a year, for Defendants to liquidate their Program

- 14 -

CMOs.

45.     Defendants misrepresented to customers that Program CMOs were safe and appropriate for retirees, retirement accounts, and/or investors with conservative investment objectives. For example:

- **Betta**. In October and December 2003, and June 2004, in Boca Raton, Florida, Betta represented to customers that Program CMOs were safe investments that were appropriate for investors with conservative investment objectives. In October 2003, in Boca Raton, Florida, Betta represented to a customer that Program CMOs were a safe investment for the customer's college education fund.

- **Branch**. In February 2005, in Honolulu, Hawaii, Branch represented to a customer that Program CMOs were safe and appropriate for retirees, retirement accounts, and investors with conservative investment objectives.

- **Caprio**. In February 2004, in Boca Raton, Florida, Caprio represented to a customer that Program CMOs were safe and appropriate for a retirement account.

- **Gagliardi**. In September 2004, in New York, Gagliardi represented to a customer that Program CMOs were safe and were an appropriate investment for a retirement account.

- **Kautz**. In May and September 2005, and January 2006, in Medford, Oregon, Kautz represented to customers that Program CMOs were safe and were an investment appropriate for their retirement funds.

- **Kornfeld**. In 2003 and 2005, in Coral Springs, Florida, Kornfeld represented to customers that Program CMOs were safe and were an appropriate investment for retirement funds.

- **McCann**. In August 2004 and June 2005, in Missoula, Montana, McCann represented to customers that Program CMOs were a safe investment and allowed recommended Program CMOs to retirees and for retirement accounts.

- **Popper**. In 2004, in Boca Raton, Florida, Popper represented to a customer that CMOs were a safe investment for a retirement account. In 2001 and 2003, in Boca Raton, Florida, Popper represented to customers that Program CMOs were safe and were an appropriate investment for retirement funds.

- **Rubin**. In 2003, 2004, and 2006, in Coral Springs, Florida, Rubin represented to customers that Program CMOs were safe and were an appropriate investment for retirement funds.

- **Shrago**. In August and December 2004, in St. Petersburg, Florida, Shrago represented to customers that Program CMOs were a safe investment and were suitable for retirees.

In fact, from at least 2004 to 2007, Defendants knew, or were severely reckless in not knowing, that Program CMOs were only suitable for sophisticated investors with a high-risk profile.

46.    Some Defendants misrepresented to customers that margin would be used sparingly and/or posed little or no risk to customers' principal. Some Defendants misrepresented to customers that buying Program CMOs on margin would reduce their overall risk by allowing them to have a more diverse CMO portfolio. Some Defendants misrepresented that they would take their customers off of margin, but failed to do so. Some Defendants invested their customers' funds using margin without notice. For example:

- **Betta**. In 2006, in Boca Raton, Florida, Betta represented to a customer that he would take the customer's account off of margin, but he did not do so.

- **Branch**. In October 2006, in Honolulu, Hawaii, Branch represented to a customer that investing in Program CMOs with a high margin balance was safer than no or a low margin balance because using margin afforded more buying power.

- **Caprio**. Between 2004 and 2007, in Boca Raton, Florida, Caprio represented to customers that he would take the customers off of margin, but he failed to do so. In October 2003 and June 2004, in Boca Raton, Florida, Caprio represented to customers that he would use margin only modestly.

- **Gagliardi**. Between 2004 and 2007, through telephone calls that occurred in New York and Florida, Gagliardi represented to a customer that using margin to purchase Program CMOs was safe and posed no risk.

- **Kautz**. In September 2005, in Medford, Oregon, Kautz represented to a customer that margin would only be used temporarily. In June and July 2006, Kautz led two other customers to open margin accounts, but did not explain the risks of using margin with Program CMOs.

- **Kornfeld**. Between 2003 and 2007, in Coral Springs, Florida, Kornfeld invested customers' funds on margin without their knowledge and without disclosing the risks of using margin to purchase Program CMOs.

- **McCann**. In June 2005 and March 2007, McCann recommended that customers purchase Program CMOs on margin because as a way to increase income. McCann failed to disclose the risks of using margin to purchase Program CMOs.

- **Popper**. In 2003, in Boca Raton, Florida, Popper requested that a customer invest in Program CMOs using margin, representing that he would only use margin modestly and that using margin to invest in Program CMOs was nothing to worry about. In 2000, in Boca Raton, Florida, Popper represented to a customer that he would use margin modestly (defined as less than 1% of her account equity) to invest in Program CMOs, and that the customer's principal would remain safe.

- **Rubin**. Between 2003 and 2007, in Coral Springs, Florida, Rubin invested customers' funds on margin without their knowledge and without disclosing the risks of using margin to purchase Program CMOs.

- **Shrago**. In November 2003, in St. Petersburg, Florida, Shrago asked a customer to complete a margin application but failed to explain the risks associated with margin and led the customer to believe that the use of margin would not jeopardize her principal. Shrago also continued to leverage this

customer's account after being instructed to take the account off of margin. In fact, from at least 2004 to 2007, Defendants heavily margined their CMO Program customers' margin accounts, which were concentrated in IOs, Inverse Floaters, and Inverse IOs, and this use of margin exposed the customers to the risk of a substantial or total loss of equity.

47.     Betta, Gagliardi, and Popper additionally misrepresented that the use of margin was risk-free because Program CMOs were backed by the United States government. For example, in December 2003, Betta, Gagliardi, and Popper represented to a customer that Program CMOs had no chance of a margin call because they were "government bonds" with "zero risk to principal." Between 2004 and 2007, Gagliardi represented to other customers that investing in Program CMOs on margin was safe because they were government backed. In fact, even government-backed Program CMOs could suffer price drops, which could and did lead to margin calls. Moreover, no guarantee protected customers from the expiration of an IO.

**E.**     **Falling CMO Prices Lead to Margin Calls**

48.     In early 2007, MBS and CMO prices began to drop in apparent response to the failure of several large subprime mortgage lenders. As a result of declining CMO prices, all CMO Program customers saw the value of their accounts decline, and many CMO Program customers who had invested on margin started to receive margin calls.

49.     Due the level of margin that Defendants had used, some CMO Program customers did not have sufficient equity to cover the margin calls. Under its margin agreement with its clearing firm, Brookstreet was financially responsible for margin calls that its customers could not cover.

50.     In June 2007, Brookstreet and its clearing firm liquidated many CMO Program customers' accounts, resulting in millions of dollars in losses. Approximately eighty of Defendants' CMO Program customer accounts were left with "deficit accounts" of approximately $36 million. The accounts not only lost all principal, but ended up with negative equity such that the account owners owed the clearing firm approximately $36 million. Total losses for all of Defendants' CMO Program customers greatly exceeded that amount.

51.     On June 21, 2007, the massive deficits in CMO Program customers' margin accounts caused Brookstreet to fall below its net capital requirements and terminate operations.

## FIRST CLAIM FOR RELIEF

### Fraud in Violation of Section 17(a) of the Securities Act

52.     The Commission realleges and incorporates by reference paragraphs 1 through 51 above.

53.     Defendants, knowingly or recklessly, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which operated or would operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

54.     Defendants' scheme included, among others, the fraudulent devices, fraudulent acts, untrue statements of material fact and material omissions described in paragraphs 20 through 47 above.

55.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

56.     The Commission realleges and incorporates by reference paragraphs 1 through 55 above.

57.     Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

58.     Defendants' scheme included, among others, the fraudulent devices, fraudulent acts, untrue statements of material fact and material omissions described in paragraphs 20 through 47 above.

59.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Declare, determine, and find that Defendants committed the violations of the federal securities laws alleged in this Complaint.

### II.

Issue a Permanent Injunction restraining and enjoining Defendants, and those persons in active concert or participation with them who receive actual notice of the judgment by personal service or otherwise, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Issue an Order requiring Defendants to provide a full accounting for, and disgorge all ill-gotten gains that they received, directly or indirectly, from, their illegal conduct, with prejudgment interest thereon.

### IV.

Issue an Order requiring Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## V.

Issue an Order requiring Defendants to preserve any records related to the subject matter of this lawsuit that are in their custody or possession or subject to their control.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of the Court.

## VII.

Grant such other and further relief as the Court may determine to be just and necessary.

Respectfully submitted:

DATED:   May 28, 2009
        Los Angeles, CA

RABIA A. CEBECI (A5501308)
*cebecir@sec.gov*
DOHOANG T. DUONG (A5501309)
*duongdo@sec.gov*
MORGAN B. WARD DORAN (A5501310)
*warddoranm@sec.gov*
MOLLY A. WHITE (A5501311)
*whitem@sec.gov*
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA  90036-3648
Phone:  323.965.3998
Fax:      323.965.3812
*Attorneys for Plaintiff*

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served by hand
delivery on May 28, 2009 on all counsel or parties of record on the attached service list.

Morgan B. Ward Doran

## SERVICE LIST

### SEC v. WILLIAM BETTA, JR., ET AL
United States District Court - Southern District of Florida
Case No.

| Defendant | Party Served |
|---|---|
| William Betta, Jr. | William Betta, Jr. <br> ███████████ <br> Boca Raton, FL 33486 |
| Travis A. Branch | Gary Victor Dubin <br> Dubin Law Offices <br> 55 Merchant Street <br> Suite 3100, Harbor Court <br> Honolulu, HI 96813 <br> Phone: 808.537.2300 <br> Fax: 808.523.7733 <br> gdubin@dubinlaw.net |
| James J. Caprio | Robert Keddie, III <br> Taylor, Colicchio, & Silverman, LLC <br> 502 Carnegie Center, Suite 103 <br> Princeton, NJ 08540 <br> Phone: 609.987.0022 <br> Fax: 609.987.0070 <br> rkeddie@tcslawyers.com |
| Troy L. Gagliardi | Troy L. Gagliardi <br> ███████████ <br> Boca Raton, FL 33431 |
| Russell M. Kautz | H. Thomas Fehn <br> Fields Fehn & Sherwin <br> 11755 Wilshire Blvd 15th Fl <br> Los Angeles, CA 90025-1521 <br> Phone: 310.473.6338 <br> Fax: 310.473.8508 <br> TomFehn@FFandslaw.com |

- 1 -

| Defendant | Party Served |
|---|---|
| Barry M. Kornfeld | James Sallah<br>Sallah & Cox, LLC<br>2101 NW Corporate Blvd.<br>Boca Raton, FL 33431<br>Phone: 561.989.9080<br>Fax: 561.989.9020<br>jds@sallahcox.com |
| Shane A. McCann | Michael A. Piazza<br>Dorsey & Whitney<br>38 Technology Drive; Suite 100<br>Irvine, California 92618-5310<br>Phone: 949.932.3614<br>Fax: 949.271.5578<br>piazza.mike@dorsey.com |
| Clifford A. Popper | Clifford A. Popper<br>████████████<br>Miami Beach, FL 33139 |
| Alfred B. Rubin | Alfred B. Rubin<br>████████████<br>Pompano Beach, FL 33062 |
| Steven I. Shrago | Dan Newman<br>Broad & Cassel<br>One Biscayne Tower, 21st Floor<br>2 South Biscayne Blvd.<br>Miami, FL 33131<br>Phone: 305.373.9467<br>Fax: 305.373.9443<br>dnewman@broadandcassel.com |

‰JS 44 (Rev. 2/08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| U.S. SECURITES AND EXCHANGE COMMISSION | WILLIAM BETTA, JR., ET AL. (see attachment) |

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **Palm Beach County**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Morgan B. Ward Doran (323.965.3230) Molly A. White (323.965.3250)
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036

Attorneys (If Known)

(see attachment)

**(d)** Check County Where Action Arose:  ❑ MIAMI- DADE  ❑ MONROE  ❑ BROWARD  ☑ PALM BEACH  ❑ MARTIN  ❑ ST. LUCIE  ❑ INDIAN RIVER  ❑ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☑ 1  U.S. Government Plaintiff

❑ 2  U.S. Government Defendant

❑ 3  Federal Question
(U.S. Government Not a Party)

❑ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                   and One Box for Defendant

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated or Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated and Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

**O9CV80803  KAM/LR5**

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 610 Agriculture | ❑ 422 Appeal 28 USC 158 | ❑ 400 State Reapportionment |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 362 Personal Injury - Med. Malpractice | ❑ 620 Other Food & Drug | ❑ 423 Withdrawal 28 USC 157 | ❑ 410 Antitrust |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | ❑ 365 Personal Injury - Product Liability | ❑ 625 Drug Related Seizure of Property 21 USC 881 | | ❑ 430 Banks and Banking |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & Slander | ❑ 368 Asbestos Personal Injury Product Liability | ❑ 630 Liquor Laws | **PROPERTY RIGHTS** | ❑ 450 Commerce |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 330 Federal Employers' Liability | | ❑ 640 R.R. & Truck | ❑ 820 Copyrights | ❑ 460 Deportation |
| ❑ 151 Medicare Act | ❑ 340 Marine | | ❑ 650 Airline Regs. | ❑ 830 Patent | ❑ 470 Racketeer Influenced and Corrupt Organizations |
| ❑ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❑ 345 Marine Product Liability | **PERSONAL PROPERTY** | ❑ 660 Occupational Safety/Health | ❑ 840 Trademark | ❑ 480 Consumer Credit |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle | ❑ 370 Other Fraud | ❑ 690 Other | | ❑ 490 Cable/Sat TV |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle Product Liability | ❑ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❑ 810 Selective Service |
| ❑ 190 Other Contract | ❑ 360 Other Personal Injury | ❑ 380 Other Personal Property Damage | ❑ 710 Fair Labor Standards Act | ❑ 861 HIA (1395ff) | ☑ 850 Securities/Commodities/ Exchange |
| ❑ 195 Contract Product Liability | | ❑ 385 Property Damage Product Liability | ❑ 720 Labor/Mgmt. Relations | ❑ 862 Black Lung (923) | ❑ 875 Customer Challenge 12 USC 3410 |
| ❑ 196 Franchise | | | ❑ 730 Labor/Mgmt.Reporting & Disclosure Act | ❑ 863 DIWC/DIWW (405(g)) ❑ 864 SSID Title XVI | ❑ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❑ 740 Railway Labor Act | ❑ 865 RSI (405(g)) | ❑ 891 Agricultural Acts |
| ❑ 210 Land Condemnation | ❑ 441 Voting | ❑ 510 Motions to Vacate Sentence | ❑ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❑ 892 Economic Stabilization Act |
| ❑ 220 Foreclosure | ❑ 442 Employment | **Habeas Corpus:** | ❑ 791 Empl. Ret. Inc. Security Act | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 893 Environmental Matters |
| ❑ 230 Rent Lease & Ejectment | ❑ 443 Housing/ Accommodations | ❑ 530 General | | ❑ 871 IRS—Third Party 26 USC 7609 | ❑ 894 Energy Allocation Act |
| ❑ 240 Torts to Land | ❑ 444 Welfare | ❑ 535 Death Penalty | **IMMIGRATION** | | ❑ 895 Freedom of Information Act |
| ❑ 245 Tort Product Liability | ❑ 445 Amer. w/Disabilities - Employment | ❑ 540 Mandamus & Other | ❑ 462 Naturalization Application | | ❑ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ❑ 290 All Other Real Property | ❑ 446 Amer. w/Disabilities - Other | ❑ 550 Civil Rights | ❑ 463 Habeas Corpus-Alien Detainee | | |
| | ❑ 440 Other Civil Rights | ❑ 555 Prison Condition | ❑ 465 Other Immigration Actions | | ❑ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
❑ 2 Removed from State Court
❑ 3 Re-filed- (see VI below)
❑ 4 Reinstated or Reopened
❑ 5 Transferred from another district (specify)
❑ 6 Multidistrict Litigation
❑ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S)**
(See instructions second page):

a) Re-filed Case ❑ YES ☑ NO    b) Related Cases ❑ YES ☑ NO

JUDGE _____    DOCKET NUMBER _____

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

15 U.S.C. § 78j(b), 15 U.S.C. § 77q(a):  Fraud in the offer, purchase, or sale of securities.

LENGTH OF TRIAL via _14_ days estimated (for both sides to try entire case)

| **VIII. REQUESTED IN COMPLAINT:** | ❑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ❑ Yes ☑ No |
|---|---|---|---|

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
May 28, 2009

FOR OFFICE USE ONLY

AMOUNT _____   RECEIPT # **WAIVED** IFP  

| Defendant | Attorney |
|---|---|
| William Betta, Jr.<br>2005 Parkside Circle South<br>Boca Raton, FL 33486 | N/A |
| Travis A. Branch<br>44 672 Kahinani Pl<br>Kaneohe, HI 96744 | Gary Victor Dubin<br>Dubin Law Offices<br>55 Merchant Street<br>Suite 3100, Harbor Court<br>Honolulu, HI 96813<br>Phone: 808.537.2300<br>Fax: 808.523.7733<br>gdubin@dubinlaw.net |
| James J. Caprio<br>2820 Center Court Drive<br>Weston , FL 33332 | Robert Keddie, III<br>Taylor, Colicchio, & Silverman, LLC<br>502 Carnegie Center, Suite 103<br>Princeton, NJ 08540<br>Phone: 609.987.0022<br>Fax: 609.987.0070<br>rkeddie@tcslawyers.com |
| Troy L. Gagliardi<br>771 N.E. 32st<br>Boca Raton, FL 33431<br>Cell: 917.825.3716 | N/A |
| Russell M. Kautz<br>106 Oregon Terrace<br>Medford, OR 97504 | H. Thomas Fehn<br>Fields Fehn & Sherwin<br>11755 Wilshire Blvd 15th Fl<br>Los Angeles, CA 90025-1521<br>Phone: 310.473.6338<br>Fax: 310.473.8508<br>TomFehn@FFandslaw.com |
| Barry M. Kornfeld<br>5929 NW 84th Terrace<br>Parkland, FL 33067 | James Sallah<br>Sallah & Cox, LLC<br>2101 NW Corporate Blvd.<br>Boca Raton, FL 33431<br>Phone: 561.989.9080<br>Fax: 561.989.9020<br>jds@sallahcox.com |

1

ELECTRONIC

**May 28, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

| Defendant | Attorney |
|---|---|
| Shane A. McCann<br>5343 Maverick Way<br>Florence, MT 59833 | Michael A. Piazza<br>Dorsey & Whitney<br>38 Technology Drive; Suite 100<br>Irvine, California 92618-5310<br>Phone: 949.932.3614<br>Fax: 949.271.5578<br>piazza.mike@dorsey.com |
| Clifford A. Popper<br>1000 South Pointe Drive<br>Miami Beach, FL 33139<br><br>3700 S. Ocean Blvd., #305<br>Highland Beach, FL 33487 | N/A |
| Alfred B. Rubin<br>1900 South Ocean Blvd, Apt 12R<br>Pompano Beach, FL 33062 | Howard S. Dargan<br>Howard S. Dargan, PA<br>13833 Wellington Trace, Suite E4-119<br>West Palm Beach, FL 33414<br>Phone: 561.795.5311<br>Fax: 561.792.4397<br>howarddarganlaw@aol.com |
| Steven I. Shrago<br>2201 2nd Street North<br>St Petersburg, FL 33704 | Dan Newman<br>Broad & Cassel<br>One Biscayne Tower, 21st Floor<br>2 South Biscayne Blvd.<br>Miami, FL 33131<br>Phone: 305.373.9467<br>Fax: 305.373.9443<br>dnewman@broadandcassel.com |

2