UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-80803-Civ-MARRA/JOHNSON

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,
vs.

WILLIAM BETTA, JR., TRAVIS
A. BRANCH, JAMES J. CAPRIO,
TROY L. GAGLIARDI, RUSSELL
M. KAUTZ, BARRY M. KORNFELD,
SHANE A. MCCANN, CLIFFORD A.
POPPER, ALFRED B. RUBIN, and
STEVEN I. SHRAGO,

    Defendants.
_____/

## ORDER AND OPINION DENYING WILLIAM BETTA'S AND CLIFFORD POPPER'S MOTIONS TO DISMISS

THIS CAUSE is before the Court upon Defendant William Betta's Motion to Dismiss Complaint for Failure to State a Claim [DE 29] and Answer and Motion to Dismiss by Clifford A. Popper, Only [DE 41].[1]  The Court has carefully considered the filings and is otherwise fully advised in the premises.

---

[1] On the last page of his answer, Defendant Clifford A. Popper ("Popper") states, "Let it be further known that Defendant Clifford Popper has reviewed, in it's entirety, the Motion to Dismiss filed by Defendant William Betta on August 20, 2009. Clifford Popper hereby adopts and incorporates the Motion to Dismiss filed by Mr. Betta as his own."  DE 40 at 5.  That is the extent of Popper's motion.

**Introduction**

The Securities and Exchange Commission ("SEC") brings this action to restrain and permanently enjoin William Betta, Jr., Travis A. Branch, James J. Caprio, Troy L. Gagliardi, Russell M. Kautz, Barry M. Kornfeld, Shane A. McCann, Clifford A. Popper, Alfred B. Rubin, and Steven I. Shrago (collectively, "Defendants") from violating the antifraud provisions of the federal securities laws.  Compl. ¶ 1.  The SEC seeks a judgment from the Court: (a) enjoining Defendants from engaging, directly or indirectly, in further violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) ordering Defendants to disgorge, with prejudgment interest, the amount by which they were unjustly enriched as a result of their violations of the federal securities laws; and (c) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).  Compl. ¶ 6.  Four of the defendants have moved to dismiss the complaint. This Opinion addresses the motions to dismiss of William Betta, Jr. ("Betta") and Clifford A. Popper.

**Factual Background**

The complaint alleges, and the Court accepts as true for purposes of the instant motion, the following:  Betta and nine other former registered representatives of now defunct broker-dealer Brookstreet Securities Corp. ("Brookstreet"), made material misrepresentations to customers in connection with

the offer, sale, or purchase of risky types of collateralized mortgage obligations ("CMOs") called Inverse Floaters, Interest Onlys ("IOs"), and Inverse IOs (collectively, "Program CMOs").  From January 2004 to June 2007, Brookstreet sponsored a program which allowed Defendants to invest their customers' funds in CMOs.  Compl. ¶ 20.  The CMO Program was operated by Brookstreet's Institutional Bond Group ("Bond Group"), which was located in Boca Raton, Florida.  Compl. ¶ 22-27.  Betta was the Bond Group's "broker liaison," meaning that he communicated with CMO Program customers on behalf of the Bond Group, and he also educated other brokers' customers about Program CMOs.  Compl. ¶¶ 25-26.  During the life of the CMO Program, Betta made false and misleading statements to customers in connection with the offer, sale, or purchase of Program CMOs.[2]  Compl. ¶ 2.  Betta's fraudulent misrepresentations and omissions helped to attract the more than 750 customer accounts that invested in the CMO Program with total investments of more than $175 million.  Compl. ¶ 3.

The Bond Group primarily traded three types of particularly risky CMOs for Brookstreet's CMO Program:  Inverse Floaters, IOS, and Inverse IOS.  Compl. ¶¶ 30-34.  Over 90% of all purchases in the CMO Program between 2004 and 2007 were these risky Program CMOs.  Compl. ¶¶ 30-34.  In addition, 14% of the Program CMOs traded

---

[2] Although Brookstreet's CMO Program started in January 2004, prior to that date Betta made material misrepresentations regarding Program CMOs to customers who later participated in the CMO Program when Betta joined Brookstreet.  Compl. ¶¶ 42-47.

by the Bond Group on behalf of CMO Program customers were non-agency CMOs that carried no government backing.  Compl. ¶ 30.  The Bond Group selected the Program CMOs that would be traded on behalf of all CMO Program customers.  Compl. ¶ 35.  Betta relayed trade recommendations to Brookstreet's brokers, who returned signed trade tickets to the Bond Group indicating that their customers consented to the proposed trades.  Compl. ¶¶ 26, 35.  The Bond Group executed all Program CMO trades for CMO Program customers.  Compl. ¶ 35.

The Bond Group typically purchased large blocks ("round lots") of CMOs that they would subsequently apportion into smaller positions ("odd lots") for distribution into the accounts of individual customers.  Compl. ¶ 36.  Before a sale, the Bond Group typically aggregated these odd lots into round lots, which were easier to trade.  *Id*.  Because CMO Program customers held odd lots that could not be readily traded, they often faced liquidity problems and delays of up to one year when they wanted to sell their positions outside the regular sales process.  Compl. ¶ 37.

Betta participated in the CMO Program, but he only had a few customers of his own.  Compl. ¶ 40.  However, Betta communicated directly with other broker's customers and made material misrepresentations to them regarding Program CMOs.  Compl. ¶¶ 26, 40, 41-47.  For example, Betta told customers that all Program CMOs were guaranteed by the United States government, when they were not.  Compl. ¶ 42.  He also told customers that Program CMOs were a liquid investment, which they were not.  Compl. ¶ 44.  In addition, Betta misrepresented that Program CMOs were

safe and appropriate for retirees and investors with conservative investment goals. Compl. ¶ 45.  Betta further told customers that the use of margin was risk-free because Program CMOs were backed by the government and, therefore, there was no risk of a margin call.  Compl. ¶ 47.  In fact, the Program CMOs purchased for Brookstreet customers were risky, volatile, illiquid, and deemed unsuitable for all but sophisticated investors with a high-risk profile.  Compl. ¶¶ 29-34.

Brokers were paid a commission on each CMO trade executed by the Bond Group.  Compl. ¶ 40.  During the life of the CMO Program, Betta received commissions of only $21,318, but he was paid a salary of $ 2.3 million for his role as broker liaison. *Id*.

When CMO prices dropped in early 2007, many Brookstreet CMO customers received margin calls.[3]  Compl. ¶ 48.  Because the Defendants had over leveraged their customers' accounts, many customers could not cover the margin calls, resulting in a total deficit or negative equity of $36 million for all of Brookstreet's customers in the CMO Program.  Compl. ¶ 50.  Brookstreet agreed to accept responsibility for the margin calls that its customers could not cover.  When Brookstreet's efforts to respond to these margin calls caused Brookstreet to fall below its net capital requirements, Brookstreet had to shut its doors.  Compl. ¶ 51.

---

[3] The SEC explains that a margin call is a demand that more money or securities be deposited in a customer's margin account when the amount in the margin account falls below the amount necessary to cover the securities purchased. DE 23 at 3 n.3.

The SEC brings this suit against Betta alleging that Betta recommended and sold CMOs to customers even though he knew, or should have known, that the highly risky CMOs he was selling were unsuitable for these customers and he failed to disclose these risks.  Compl. ¶¶ 44-45, 53, 57.  In his motion, Betta, proceeding *pro se*, argues that the complaint fails to state a claim and does not allege securities fraud with sufficient particularity.

## Pleading Requirements

The Eleventh Circuit requires a plaintiff alleging securities fraud under Rule 10b-5[4] to plead (1) a false statement or omission of material fact; (2) made with scienter; (3) upon which the plaintiff justifiably relied; (4) that proximately caused the plaintiff's injury."  *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1446 (11th Cir. 1997); *see also SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

---

[4] Section 10(b) of the Securities and Exchange Act of 1934 ("§ 10(b)") makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commissioner may prescribe."  15 U.S.C. § 78j (2000).  Pursuant to this authority, Rule 10b-5 makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

As with any fraud claim, a plaintiff must plead the circumstances of the conduct with particularity. See Fed.R.Civ.P. 9(b); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). Complaints alleging falsity "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, a complaint must present facts from which "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also* 15 U.S.C. § 78u-4(b)(2). As used by the United States Supreme Court in *Aaron v. Sec. & Exch. Comm'n,* 446 U.S. 680, 686 n.5 (1980), the term "scienter" is defined as "a mental state embracing intent to deceive, manipulate, or defraud." In this circuit, scienter consists of intent to defraud or "severe recklessness" on the part of the defendant. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, __ F.3d __, Case No. 09-10954, 2010 WL 154519, *4 (11th Cir. Jan. 19, 2010); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989). In ruling on a Rule 12(b)(6) motion to dismiss such as this one, the Court must accept the factual allegations as true and construe them in the light most favorable to the plaintiff. *Clark v. Riley*, _ F.3d _, Case No. 08-11978, 2010 WL 377020, *3 (11th Cir. Feb. 4, 2010) citing *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

**Discussion**

A.   Rule 12(b)(6)

Betta asserts that the "[c]omplaint is fatally flawed . . . because it does not charge that he made any misstatements or omissions in connection with the purchase or sale of securities." DE 30 at 9. Betta also argues that the complaint is internally inconsistent with regard to the dates of the fraud. On review of the complaint, the Court cannot agree.

**Misstatements in Connection With a Purchase**

Paragraph two of the complaint alleges that all defendants, including Betta,

> made false and misleading statements in connection with the offer, sale, or purchase of certain types of Collateralized Mortgage Obligations ("CMOs"). Defendants told their customers that the CMOs in which they would invest were safe, secure, liquid investments that were suitable for retirees, retirement accounts, and investors with conservative investment goals. Contrary to what they told customers, between 2004 and 2007 Defendants invested in risky types of CMOs that (1) were not all guaranteed by the United States government; (2) jeopardized customers' yield and principal; (3) were largely illiquid; and (4) were only suitable for sophisticated investors with a high-risk investment profile.

Compl. ¶ 2. The complaint further alleges that in June 2004, in Boca Raton, Florida, Betta misrepresented to customers that Program CMOs presented no risk to principal and/or could not lose principal (¶ 43) and that Program CMOs were guaranteed by the federal government, when they were not (¶ 42). Reading these paragraphs and the remaining allegations in a light most favorable to the SEC, Betta's argument that the complaint fails to associate Betta's misrepresentations to customers in connection

with the offer, sale, and purchase of Program CMOs is rejected.  *See* Compl. ¶¶ 2, 3, 22, 25, 30, 35, 36, 38, 40.

**Inconsistent Dates**

Betta asserts that the complaint is deficient because on the one hand it alleges that he worked as a registered representative in Brookstreet's Boca Raton office between May 2004 and June 2007, but on the other hand it alleges that he made false statements in October and December of 2003, before he began his employment at Brookstreet.  Compl. ¶¶ 7, 42-45, 47.  Therefore, Betta claims that the complaint is internally inconsistent where it alleges securities fraud violations that pre-date his employment at Brookstreet and the alleged commencement of the CMO Program.  In addition, Betta claims that he was not trading from October 2003 to May 2004, and that "public records show that Betta was not licensed by any security regulator or associated with any regulated securities firm from October 2003 to May 2004."  DE 30 at 2.

First, just because the complaint alleges that Betta made misstatements in connection with the purchase or sale of securities prior to his employment with Brooksteeet, those allegations do not negate the assertions that he committed securities fraud in 2004 while at Brookstreet.  Compl. ¶¶ 42, 43, 45.  The allegations that Betta violated securities laws while at Brookstreet state a valid claim.  At worst, the allegations that relate to facts that pre-date Betta's employment with Brookstreet are mere surplusage.  Second, the fact that Betta was not licenced at a

certain time does not negate the allegations that he made misrepresentations about CMOs during that time.  Third, this issue of Betta's licensure is not properly before the Court, because it raises factual issues not alleged in the complaint.  At this stage, the Court is not at liberty to consider facts outside the four corners of the complaint.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (review of facial challenges is limited to the four corners of the complaint); *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984) ("[c]onsideration of matters beyond the complaint is improper in the context of a motion to dismiss. . . .").  Betta may raise this issue on a motion for summary judgment, if appropriate.

**B.     Rule 9(b)**

Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud" be "stated with particularity."  Fed.R.Civ.P. 9(b).  "[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

Betta argues that "the complaint fails to identify the CMO (type, duration, risk characteristics), the relationship of Betta to any customer, the amount of the purchase, the customer's financial condition and sophistication in relation to the purchase, whether the customer suffered any loss as a result of the misrepresentation or omission and how, if at all, Betta benefitted from the transaction."  DE 30 at 8-9.

Betta also asserts that the complaint does not allege motive or enough detail to allege scienter.  Finally, Betta argues that the allegation that he represented to a customer that he would take the customer's account off of margin, but did not do so (¶ 46) does not allege a securities transaction at all.  DE 29 at 2.

The complaint satisfies the requirements of Rule 9(b) by stating the "who, what, when, where, and how" of the alleged fraud with adequate particularity.  Specifically, the complaint alleges that between 2003 and 2007, in Boca Raton, Florida, Betta made material misrepresentations to customers regarding the security, risk, liquidity, and suitability of Program CMOs, i.e., Inverse Floaters, Interest Onlies, and Inverse Interest Onlies.  Compl. ¶¶ 30, 42-45.  It is alleged that in 2004, in Boca Raton, Florida, Betta misrepresented:  That Program CMOs were guaranteed by the United States government (¶ 42); that Program CMOs presented no risk to principal (¶ 43); that Program CMOs were safe investments appropriate for conservative investment objectives (¶ 45), and that Betta received over $2.3 million in salary and commissions for his role in the fraudulent scheme (¶ 40).  These allegations adequately state the circumstances of the alleged fraud with sufficient particularity.

Relying on *Ashcroft v. Iqbal*,  - U.S. --, 129 S.Ct. 1937 (2009), Betta asserts that the SEC must allege specific facts showing that he acted with scienter.  If Betta is arguing that the heightened standards for securities fraud class actions imposed by the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), applies here, he is mistaken.  The PSLRA applies only to private actions,

not to actions filed by the SEC.  *See* 15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter"); *In re Reserve Fund Securities and Derivative Litigation*, Case Nos. 09 MD 2011, 09 Civ 4346, 2010 WL 685013, *6 (S.D.N.Y. Feb. 24, 2010); *see also SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008);[5] *SEC v. ICN Pharmaceuticals, Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) ("The 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC").

The Supreme Court's holding in *Iqbal* states that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Relying on this holding, Betta argues that the SEC's allegations are conclusory in

---

[5] "Any argument that Congress intended to apply the [PSLRA's standard] to SEC enforcement actions ignores the statute's plain language.... Indeed, as the Supreme Court explained, Congress designed the PSLRA specifically to address the perceived abuses of *private* securities litigation.  *See Tellabs*, 127 S.Ct. at 2508.  Extending its 'heightened standard' to SEC enforcement actions, a context not found by Congress to harbor such abuses, does violence to that intent: had Congress wanted the PSLRA to restrain the SEC's ability to plead securities fraud, it could have said so easily." *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) (emphasis in original); *see also SEC v. Tambone*, 550 F .3d 106, 119 (1st Cir. 2008) ("[T]he additional scrutiny applied to allegations of scienter in private securities fraud complaints is unwarranted in this case.... The SEC need only allege scienter generally."); *SEC v. Berry*, 580 F. Supp. 2d 911, 920-21 (N.D. Cal. 2008); *S.E.C. v. Kearns*, Case No. 09-3599, 2010 WL 715467, *6 n.5 (D.N.J. Feb. 23, 2010).

nature, and it would be unreasonable to infer that he made misrepresentations to Brookstreet CMO customers.  The Court does not agree.  Granting the plaintiff all favorable inferences, as the Court must on a motion to dismiss, the SEC has alleged sufficient circumstances that provide a facially plausible inference that Betta had the intent to deceive, manipulate, or defraud investors.  *See* Compl. ¶¶ 40-45, 53, 57.  Therefore, the Court agrees with the SEC that the complaint adequately pleads factual allegations and scienter.  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982) (holding that "[s]cienter [for Section 17(a)(1) or Section 10(b) violations] may be established by a showing of knowing misconduct or severe recklessness").[6]

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant William Betta's Motion to Dismiss Complaint for Failure to State a Claim **[DE 29] is DENIED**.  It is further

**ORDERED AND ADJUDGED** that Motion to Dismiss by Clifford A. Popper **[DE 41] is DENIED**.  Defendant Popper's Motion to Dismiss neither complies with Local Rule 7.1, which requires that all motions to dismiss be accompanied by a memorandum of law citing supporting authorities, nor provides specific challenges to the complaint regarding Popper himself.  L.R. 7.1(A)(1).  The assignments of error in Defendant Betta's Motion to Dismiss that are specific to his own conduct are not "adoptable" by

---

[6] Betta argues that the allegation that he promised to take a customer's account off margin is not an allegation of securities fraud.  Even if Betta is correct in this regard, in view of all of the other allegations, it cannot result in the dismissal of the SEC's complaint.

another defendant.  To the extent that any of Betta's arguments are applicable to Popper, they are also denied as to Popper.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 15th day of March, 2010.

_____
KENNETH A. MARRA
United States District Judge

copies to:

All counsel of record
All pro se parties