UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-80803-Civ-MARRA/JOHNSON

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

vs.

WILLIAM BETTA, JR., TRAVIS
A. BRANCH, JAMES J. CAPRIO,
TROY L. GAGLIARDI, RUSSELL
M. KAUTZ, BARRY M. KORNFELD,
SHANE A. MCCANN, CLIFFORD A.
POPPER, ALFRED B. RUBIN, and
STEVEN I. SHRAGO,

       Defendants.

_____/

<u>**ORDER AND OPINION RE: TROY GAGLIARDI**</u>

THIS CAUSE is before the Court upon the Motion by Plaintiff Securities and Exchange Commission for Summary Judgment Against Troy L. Gagliardi [DE 134]. The Court has carefully considered the motion, response, reply, entire court record, and is otherwise fully advised in the premises.

<u>Introduction</u>

The Securities and Exchange Commission ("SEC") brings this action to restrain and permanently enjoin Troy L. Gagliardi, William Betta, Jr., Travis A. Branch, James J. Caprio, Russell M. Kautz, Barry M. Kornfeld, Shane A. McCann, Clifford A. Popper, Alfred B. Rubin, and Steven I. Shrago (collectively, "Defendants") from violating the antifraud provisions of the federal securities laws. Compl. ¶ 1. The SEC seeks a

judgment from the Court: (a) enjoining Defendants from engaging, directly or indirectly, in further violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) ordering Defendants to disgorge, with prejudgment interest, the amount by which they were unjustly enriched as a result of their violations of the federal securities laws; and (c) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Compl. ¶ 6. The SEC has moved for summary judgment against three of the defendants. This Opinion addresses the motion for summary judgment against Troy L. Gagliardi ("Gagliardi"). Gagliardi is proceeding *pro se*.

**Undisputed Facts**[1]

Brookstreet Securities Corp. ("Brookstreet") was a broker-dealer and investment adviser with locations nationwide. It collapsed in June 2007. Plaintiff's Statement of Undisputed Facts in Support of its Motion for Summary Judgment Against Defendant Troy Gagliardi, DE 136, ("SEC SUF") ¶¶ 1, 5. From January 2004 to

---

[1] There are three motions for summary judgment against Brookstreet registered representatives under consideration. All three defendants are proceeding *pro se*. Because these defendants are not legally trained, the Court accepts all undisputed established facts and applies them to each defendant, whether presented by that defendant or another defendant. *Fils v. City of Aventura,* – F.3d –, 2011 WL 3241618, *9 (11th Cir. July 28, 2011) ("A district court may look at all the evidence in the record to determine whether issues of material fact exist regarding the plaintiff's asserted causes of action.")

June 2007, Brookstreet sponsored a program that encouraged its registered representatives to sell collateralized mortgage obligations ("CMOs") to retail customers (the "CMO Program").  SEC SUF ¶ 58.  CMOs are mortgage-backed securities that redirect the cash flows from a pool of mortgages among different classes of investors.  Declaration of Dr. John D. Finnerty ("Finnerty Decl."), DE 131, ¶ 3.  Mortgage-backed securities are created by contributing a pool of mortgage loans to a separate legal entity, such as a trust, which issues certificates that entitle holders to receive a portion of the monthly cash flows from the pool of mortgages. *Id.*  These certificates are usually in the form of tradable securities, which are arranged into several classes.  These CMO classes are prioritized with respect to their right to receive payments of principal and interest coming from the underlying mortgage portfolio.  *Id.*  The simplest mortgage-backed securities structure is the pass-through security, which distributes the cash flows pro rata among the security holders.  As a result, the prepayment risk on the underlying mortgages is also passed straight through to security holders.  *Id.*

Defendant Clifford A. Popper ("Popper") managed the CMO Program through Brookstreet's Institutional Bond Group located in Boca Raton, Florida.  SEC SUF ¶ 59. The Institutional Bond Group used seminars at Brookstreet's annual marketing conferences, internal e-mail distributions, and conference calls to encourage Brookstreet's registered representatives, including Defendant Gagliardi, to participate in the CMO Program.  SEC SUF ¶ 60.

The CMO Program dealt primarily in three types of CMOs: interest only CMOs ("IOs"); inverse floating rate CMOs ("Inverse Floaters"); and inverse interest only CMOs ("Inverse IOs") (collectively, "Program CMOs").  Program CMOs are among the riskiest types of mortgage derivatives available for trade and are generally not suitable for customers who seek safety of principal.  Finnerty Decl. ¶ 13.  The National Association of Securities Dealers, the industry's self-regulatory organization, issued a notice to its members in 1993 alerting them that IO's and Inverse Floaters were only suitable for sophisticated investors with a high-risk profile.  Finnerty Decl. ¶ 17.

**Interest Only CMOs**

Interest Only CMOs, or IOs, are created by separating the interest payment stream and the principal repayment stream from a portfolio of mortgage loans into two classes of CMOs.  Finnerty Decl. ¶ 4.  IOs receive all of the interest but none of the principal.  *Id*.  Instead, their coupon payments are based on a "notional" principal amount.  As the underlying mortgages prepay, the notional principal amount amortizes, and the IO cash flow declines.  IOs are typically sold at deep discounts to their notional amount.  Because there is no principal amount, the IO is said to "expire" when the underlying mortgages are fully paid and the flow of interest payments stops.  *Id*.

IOs exhibit substantial price volatility as interest rates change.  Finnerty Decl. ¶ 5; Brookstreet Trade Confirmation p. 3 (DE 170).  IOs exhibit much greater price

variability than the underlying portfolio of mortgages from which they were created. Finnerty Decl. ¶ 5.  IOs have less liquidity than other CMO classes because there is a limited market for them.  *Id.*  At Brookstreet, IO liquidity was further diminished because to effect a sale on behalf of a customer holding an odd lot (*i.e.,* small) amount, Brookstreet had to find an internal buyer for the odd lot or else aggregate odd lot amounts from several Brookstreet customers into a round lot large enough to sell to a CMO dealer.  *Id.*

IOs are unusually risky CMOs and are considered by some market professionals to be among the riskiest of the mortgage securities.  Finnerty Decl. ¶ 6.  One of the most serious problems with investing in IOs is the way in which their already-volatile price changes can be exaggerated by changes in investor perceptions when interest rates change.  Actual price fluctuations may be much more severe than predicted, which can lead to failed hedges.  Buyers may abandon Ios when interest rates are falling rapidly because of the sharp expected deterioration in IO prices.  Ios are one of the few types of CMOs for which there is a reasonable change that investors might never recoup their initial investment, even if the investment is held until it expires. *Id.*

### Inverse Floating Rate CMOs

Inverse Floaters are created from a fixed-rate CMO tranche by separating it into two securities.  Finnerty Decl. ¶ 7.  One is a floating-rate CMO, which is similar to a traditional corporate floating-rate note except for prepayments, and the other is

an Inverse Floater, which is similar to a corporate inverse floating-rate note, again except for prepayments.  The fixed-rate CMO tranche can be partitioned in any number of ways but the securities in combination will exhaust the available cash flow that would otherwise be paid to the fixed-payment CMO tranche.  *Id*.

Interest payments on Inverse Floaters vary inversely with an index, such as one of the London Interbank Offer Rates ("LIBOR").  Finnerty Decl. ¶ 8.  Inverse Floaters are typically more leveraged than other CMO tranches.  The coupon rate formula for an Inverse Floater is usually designed to provide what is termed coupon leverage, which occurs when the coupon rate changes based on a multiple of the change in LIBOR.  As the index drops or rises, the coupon rate on the Inverse Floater rises or falls at an accelerated pace, which magnifies the Inverse Floater's price volatility. The greater the coupon leverage, the more the Inverse Floater's coupon rate changes for an given change in LIBOR, and the greater the interest rate sensitivity of the Inverse Floater's price.  *Id*.  Due in part to this volatility, there is a limited market for Inverse Floaters.  Finnerty Decl. ¶ 9.

Inverse Floaters expose investors to concentrated interest rate risk, which can quickly lead to devastating market losses when interest rates rise.  Finnerty Decl. ¶ 10; Gagliardi 7/10/08 Depo. 382-83.  Nearly every undesirable characteristic of mortgage securities can be found in concentrated form in many Inverse Floaters. Finnerty Decl. ¶ 10.  They are very risky but not in a uniform way, which makes them exceptionally difficult to value and manage.  *Id*.

**Inverse Interest Only CMOs**

Inverse IOs are riskier than other types of CMOs.  Gagliardi 7/10/08 Depo. 182.

Inverse IOs combine the interest-only feature of IOs and the inverse-floating-rate

structure of Inverse Floaters; they also combine the risk-enhancing features of IOs

and Inverse Floaters.  Finnerty Decl. ¶ 11.  Inverse IOs are created by separating an IO

into two securities, one that makes distributions based on a floating-rate formula and

the other that makes distributions based on an inverse-floating-rate formula.  *Id*.  As

with the underlying IO, because there is no principal amount, Inverse IOs expire when

the underlying mortgages are fully paid and the flow of interest payment stops.  *Id*.

Inverse IOs exhibit an unusually wide range of price variability, which makes them a

highly speculative investment, and one that is unsuitable for an investor seeking

safety of principal.  Finnerty Decl. ¶ 12.

**Margin**

A margin account is an account in which the broker lends the customer cash to

purchase securities.  Other securities held by the investor serve as collateral for the

loan.  Brookstreet's Trade Confirmations contain the following advisory:

> Utilizing a margin loan for the purchase of CMOs could require an
> additional deposit (margin call) of funds and/or securities in the event
> of adverse market conditions.  Failure to meet margin call could result
> in a liquidation of the securities in the account in order to meet the
> call.  In addition, the use of a margin loan will amplify the effects of an
> adverse market environment.  Specifically with regard to margin
> investing in "Inverse-Floating Rate" CMOs, there is a potential for
> exacerbation of the inherent risk of loss of equity from investing in
> these securities as an increase in the market rate of interest would

Page 7 of  25

result in, not only a decline of their price which would necessitate a
margin call, but also a potential rise in the level of interest being
charged on any margin debit that is owed on the account.

Investing in CMOs is by the instrument's nature speculative.  If you are
not comfortable with the aspects of these investments, please withdraw
from these instruments immediately by calling your Brookstreet Member
or the Brookstreet Client Services Desk at (888) 456-2578 for assistance.

Brookstreet Trade Confirmation, p. 3 (DE 170-1).

**The CMO Program**

CMOs were introduced to Gagliardi and other Brookstreet brokers at their

annual conference in approximately the spring of 2004.  Gagliardi 7/10/08 Depo. 162.

At that conference, Clifford Popper and the CMO Program were introduced by

Brookstreet President Stan Brooks.  Popper represented to the brokers at the

conference that he had extensive experience with government bond money

management and that through the purchase of CMOs, he could achieve stable

principal and income yielding portfolios for Brookstreet clients.  He told the brokers

that because of his expertise, he could obtain CMOs for retail investor portfolios at

institutional prices and create a balanced portfolio in government guaranteed bonds

that produced good income.  Popper stressed that the bonds he would purchase for

the CMO Program would have an implied AAA rating because they were backed by the

government.  He further represented that he could build a diversified portfolio that

provided individual investors stable income and preservation of principal based on the

diversification of the holdings.  *See, e.g.,* DE 133-32.  Gagliardi believed Popper's

representations that Popper could manage the risks associated with Program CMOs

because Brookstreet's compliance division and senior management highly touted

Popper's experience and expertise and permitted Popper to educate Brookstreet

representatives and manage Brookstreet's CMO Program.  Gagliardi 7/10/08 Depo. 99,

137, 144-46, 162, 207, Gagliardi 1/5/11 Depo. 119-122, 133-35, 137, 244-45, 397, 403.

At that time, Popper provided the brokers with written materials (a "Black

Folder") (approved by Brookstreet's senior management, compliance division and

counsel) that Gagliardi gave to potential CMO Program customers prior to their

investing.  Gagliardi Aff. ¶ 3 [DE 169-4]; Gagliardi Facts in Opp. ("SDF"), DE 169, ¶ 2.

These materials included *An Investor's Guide to Collateralized Mortgage Obligations*

("Investor's Guide"), a two-page cover letter to the guide from Popper,[2] and

informative sheets entitled Institutional Mortgage Backed Bonds.  *See*, DE 169-5.  In

describing the CMO Program, the written materials state, among other things:

> Objectives include capital preservation and high total return.  Balancing
> the portfolio is achieved by purchasing government agency bonds that
> benefit from rising rates, falling rates, steepening and flattening yield
> curves (depending on market circumstances);
>
> Principal is backed by a government agency such as Ginnie Mae, or
> quasi-government agencies such as Fannie Mae or Freddie Mac;

---

[2]  Popper's letter stated that CMOs "can behave with a high degree of volatility depending on the current interest rate climate.  While there is generally a low risk of default, due to their government agency backing, there is no guarantee of principal protection.  [CMO's] value can and do fluctuate largely and there is the potential, if an issue is sold prior to maturity, that the investor will get paid less than his initial investment amount."  DE 169-6.

> Both categories of CMOs used in these portfolios generate monthly
> income and are AAA or implied AAA due to the rating of the underlying
> collateral;
>
> Used in conjunction with each other and with certain other similar
> instruments, a high level of return concurrent with capital preservation
> may be achieved.

Gagliardi 7/10/08 Depo. 228-31; Gagliardi 1/15/11 Depo. 203, 205-06, 209, 225.  The

Investor's Guide stated that CMOs offer "regular payments, relative safety, and

notable yield advantages over other fixed-income securities of comparable credit

quality."  DE 169-7 at 3 of 17.  Popper represented and Brookstreet brokers

understood that the CMO Program managed by Popper was an actively managed

account and that it would be adjusted to compensate for outside forces such as

interest rate fluctuations.  DE 133-22 at 5-6.

Each client who decided that they wanted to participate in the CMO Program

was required to execute and initial the Brookstreet CMO Disclosure Form.  Among

other disclosures, each client acknowledged that:

> ▸ The primary types of CMOs in my account will be "Inverse Floating Rate"
> and "Interest Only" CMOs.  In general Inverse Floating Rate CMOs
> increase in value when interest rates fall and decrease in value when
> interest rates rise.  Interest Only CMOs increase in value when interest
> rates rise and decrease in value when interest rates fall.
>
> ▸ By selling CMOs rather [than] waiting for the final principal payment,
> the securities may be worth less than waiting for the final principal
> payment, and the securities may be worth less than their original face
> value.
>
> ▸ For CMOs purchased at a premium, the guarantee as to principal applies
> only to the par value of the security and not to any premium paid.

▸    For Interest Only CMOs purchased, if prepayment rates are high, then I
     may actually receive less cash back than initially invested.

▸    For Inverse Floating Rate CMOs, rising rates will lower interest payments
     and extend return of principal beyond the anticipated average life.  This
     may increase or decrease the effective yield.

▸    I have received and read the "Investor's Guide to Collateralized
     Mortgage Obligations" booklet which was provided to me by my
     Registered Representative.

DE 133-22 at 7.

The SEC brings this suit against Gagliardi alleging that Gagliardi recommended

and sold CMOs to customers even though he knew, or should have known, that the

highly risky CMOs he was selling were unsuitable for these customers and he failed to

disclose these risks.  Compl. ¶¶ 43-45, 53, 57.

**Gagliardi's Participation in the CMO Program**

Gagliardi was a registered representative with Brookstreet and he served as a

supervisor for Brookstreet's Boca Raton office.  Gagliardi 7/10/08 Depo. 228-31;

Gagliardi 1/15/11 Depo. 203, 205-06, 209, 225.  Most everything Gagliardi knew about

CMOs, and that which he conveyed to investors, he learned from Popper.[3]  When

Gagliardi first started recommending Program CMOs to customers in 2004, he did not

understand the risks associated with them.  Gagliardi 7/10/08 Depo. 213-18, 244,

_____

[3]  He also relied on the materials Brookstreet provided in the Black Folder, and
he did general searches on the internet.  Gagliardi SDF ¶ 14.  In 2007, Gagliardi took a
required internet course offered by LaSalle that lasted a few hours.  Gagliardi
7/10/08 Depo. 28-29.

248-49, 382, 394, DE 169 ¶ 12; Gagliardi 1/5/11 Depo. 393.  Until 2006, Gagliardi was

unaware that IOs may unexpectedly mature early or "expire," or that the CMO

Program invested in privately-issued CMOs, which carried no express or implied

government backing ("Non-Agency CMOs").  Gagliardi 7/10/08 Depo. 230-32, 434-35;

Gagliardi 1/5/11 Depo. 204-05.  Gagliardi recommended the CMO Program to

customers with conservative investment objectives who told him that they wanted to

invest in products that had little risk, as well as customers, during 2004 and 2005,

who indicated that "preservation of capital" was their main investment objective.

Gagliardi 7/10/08 Depo. 244; Gagliardi 1/5/11 Depo. 146-47, 303-04, 443-44, 448.

Gagliardi told his customers that Program CMOs were appropriate for retirees and,

during 2004 and 2005, that they were well-suited for the conservative segment of

their investment portfolio because they were so safe.  Gagliardi 7/10/08 Depo. 382.

     Gagliardi believed all of these representations were accurate because it was

Gagliardi's understanding that (1) the SEC and the Financial Industry Regulatory

Authority ("FINRA") "had vetted and reviewed Brookstreet's CMO Program without

action in the past;"[4] (2) Brookstreet's compliance and management divisions along

---

    [4]  The SEC conducted a formal investigation of Brookstreet's CMO Program in
2004 and took no action.  Gagliardi Aff. ¶ 32.  (In response to this statement, the SEC
filed a Declaration of Morgan Doran which referenced an action by the SEC against
Jamie Solow, a registered representative associated with a broker-dealer named
Archer Alexander Securities Corp.  The Court is not certain how Solow and Archer
Alexander Securities Corp. relate to the SEC's investigation of Brookstreet.)  From
2004 to 2007, FINRA knew that Brookstreet had a CMO Program, that Defendant
Popper was managing the Program, and did nothing about it.  Gagliardi Aff. ¶ 33.

with its legal counsel had fully approved its CMO Program and written materials; and (3) both internal and external audits approved the CMO Program.  Gagliardi 7/10/08 Depo. 438-440.  In May, 2003, Gagliardi was aware that the National Association of Securities Dealers ("NASD") (now "FINRA") wrote an advisory review letter to ABN AMRO Financial Services, Inc., regarding a proposed presentation entitled, "CMO, A Strong Foundation."  The NASD stated in its review that "[a]lthough GMOs (sic) generally offer low minimum investment risk, they are subject to market risk like all investment securities. . ."  Gagliardi Aff. ¶ 39, DE 169-28.

Gagliardi invested his own money in the Brookstreet CMO Program.  Gagliardi Aff. ¶ 9; DE 169-21, 169-22.  He also had friends and family invest in Program CMOs. Gagliardi Aff. ¶ 28.  Between 2004 and 2007, Gagliardi's personal account at Brookstreet lost more than $150,000 in the Brookstreet CMO Program.  Gagliardi Aff. ¶ 10.

When Gagliardi had a client interested in investing in CMOs, it was Popper, not Gagliardi, who determined which CMOs were best for that investor.  Gagliardi 7/10/08 Depo. 199.  But Gagliardi signed a trade ticket for each of his customer's CMO transactions.  Gagliardi 1/5/11 Depo. 205.  Brookstreet provided each investor with a trade confirmation for every CMO transaction made in their accounts.

---

From 2004 to 2007, FINRA repeatedly inspected Brookstreet's Boca Raton Office and never took any action against the firm as a result of its CMO Program.  Gagliardi Aff. ¶ 34.

Gagliardi Aff. ¶ 7.  From 2004 to 2007, these confirmations included the following language:

> As with other high-risk tranches, Inverse Floaters are only suitable for sophisticated investors with a high-risk profile.  You acknowledge that you have read the Understanding CMO disclosure brochure and are suitable for this type of investment and it is consistent with your investing objectives.  You also acknowledge that there may be periods of occasional illiquidity.

 DE 170.  It also included other "Important CMO Information," including the information on margin accounts cited above, as well as other risk warnings.  *Id*.  Some investors initialed and signed a CMO Disclosure Form acknowledging their understanding of the risks involved.  Gagliardi 7/10/08 Depo. 241; *see* DE 169-11 and 169-12 (examples of the form).

Gagliardi recommended margin as a means to diversify risk in his customers' investment portfolios because it provided clients access to more money (CMOs pay higher interest than the interest on margin balances) that could be used to invest in different CMO bonds.  Gagliardi 1/5/11 Depo. 151-54; Gagliardi 7/10/08 Depo. 301-04. 357, 392, DE 169 ¶ 9, 23.  Prior to investing in the CMO Program on margin, each of Gagliardi's customers was required to sign a Brookstreet margin agreement that disclosed the costs and risks of margin.  Gagliardi Aff. ¶ 16; *see, e.g.,* DE 169-32.  Gagliardi had control over the level of margin in his customer's accounts.

Of Gagliardi's 150-200 Brookstreet customers, approximately 11-15 customers, representing 31 different accounts, were invested in the CMO Program.  Gagliardi Aff.

¶ 11.  Most of Gagliardi's customers in the CMO Program were institutional, but not all.[5]  Gagliardi SDF ¶ 34; Gagliardi 2008 Depo. 133-34, 212.  Of Gagliardi's customers invested in CMOs, 46.97% of their funds were invested in Inverse Floaters, 15.87% in IOs, and 20.85% in Inverse IOs.  Finnerty Decl. ¶ 18.  Non-Agency CMOs accounted for 5.83% of Gagliardi's customer's total Program CMO Trades.  Finnerty Decl. ¶ 23.

As a supervisor, Gagliardi received warnings about the CMO Program.  For example, on June 9, 2006, Gagliardi received an e-mail from Brookstreet's compliance department titled "Unsuitable CMO Investors/Liquidation Only," that listed over 650 CMO Program customer accounts, including 13 of his own, that were not suitable for the CMO program.  Gagliardi SDF ¶ 49.  In August 2006, over the span of three days, Gagliardi received approximately 100 e-mails from Brookstreet regarding unsuitable investors in the CMO Program.  Gagliardi SDF ¶ 50.  Gagliardi did not consider these e-mails to be red flags because it was part of "an ongoing process that tightened up suitability from corporate headquarters."  Gagliardi 1/5/11 Depo. 271.

Gagliardi was aware that both brokers and customers had trouble understanding Program CMOs.  Gagliardi 1/5/11 Depo. 342-43.  In 2006, when Gagliardi saw increased price volatility, he contacted or met with his CMO Program clients and offered to put them on "sell only" status to permit them to liquidate their

---

[5]  No facts are presented regarding the sophistication level of the retail customers.

positions in the CMO Program.  Gagliardi SDF ¶ 12; Gagliardi 7/10/08 Depo. 214, 382.

In September 2006, at least one customer complained that his account was on "sell

only" for "an enormously long period of time," to the point where he felt "as though I

have been held hostage and that if I don't push for action, I will linger on 'sell only'

for the duration of these instruments."  DE 177-4.

Brookstreet stopped operating in June 2007 due to excessive margin calls that

the firm could not cover.  Gagliardi SDF ¶ 57.  Eleven of Gagliardi's 31 customer

accounts ended up owing Brookstreet's clearing firm a combined $12.1 million.

Kassabgui Decl. ¶ 4, DE 133.  In contrast, Gagliardi received over $3 million in

commissions from CMO trades between 2004 and 2007.  Finnerty Decl. ¶ 26, Gagliardi

SDF ¶ 70.  After experiencing the margin calls in 2007, Gagliardi agrees that Program

CMOs are risky securities that are inconsistent with investment objectives like

preservation of capital.  Gagliardi 1/5/11 Depo. 232, 315, 382-83.  Gagliardi would

not now recommend Program CMOs for retirement accounts.  Gagliardi SDF ¶ 42.

## STANDARD OF REVIEW

Summary judgment is proper if the record evinces that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed.R.Civ.P. 56(c).  A dispute is genuine if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).  A fact is material if it is one that

might affect the outcome of the case.  *See id.*  When a court considers whether or

not to enter summary judgment, it views all of the evidence, and all inferences

drawn therefrom, in the light most favorable to the non-moving party.  *See Hairston*

*v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  "It is not the court's

role to weigh conflicting evidence or to make credibility determinations; the

non-movant's evidence is to be accepted for purposes of summary judgment."  *State*

*Farm Mut. Auto. Ins. Co. v. Duckworth*, – F.3d –, 2011 WL 3505267, 14 (11th Cir. Aug.

11, 2011) quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.

1996).

The party moving for summary judgment "always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those

portions of the 'pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Once this initial

demonstration under Rule 56(c) is made, the burden of production, not persuasion,

shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings

and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for

trial.'"  *Id.* at 324; *see also* Fed. R. Civ. P. 56(e).  In meeting this burden the

nonmoving party "must do more than simply show that there is a metaphysical doubt

as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986).  That party must demonstrate that there is a "genuine issue for

trial." *Id*. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id*.  In the summary judgment context, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney.  *Loren v. Sasser,* 309 F.3d 1296, 1301 (11th Cir. 2002).

## DISCUSSION

### Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act

Sections 17(a)(1) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) and Rule 10b-5 of the Exchange Act, which proscribe fraudulent conduct in connection with the purchase or sale of securities, both prohibit essentially the same type of practices.  *United States v. Naftalin,* 441 U.S. 768, 773 n.4 (1979).  To establish violations of these antifraud provisions, the SEC must show Gagliardi: (1) made a false statement or omission; (2) that was material; (3) that he acted with scienter; (4) in connection with the purchase or sale of securities; (5) while using the facilities of interstate commerce. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).  The SEC argues that Gagliardi has admitted each of these elements and, therefore, summary judgment is appropriate.  Because there are genuine issues of material fact regarding whether Gagliardi acted with scienter, summary judgment will be denied on the SEC's claim that Gagliardi violated §17(a)(1) of the Securities Act and §10(b) and Rule 10b-5

of the Exchange Act.  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994) (liability cannot attach when at least one element critical for recovery under 10b-5 is absent); *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001).

## Scienter

Scienter constitutes an important and necessary element of a § 10(b) securities fraud violation.  In *Ernst & Ernst v. Hochfelder*, the Supreme Court announced that scienter is "a mental state embracing an intent to deceive, manipulate, or defraud." 425 U.S. 185, 193 n.12 (1976).  A plaintiff cannot recover without proving that a defendant made a material misstatement, not merely innocently or negligently, but with *an intent to deceive*.  *Merck & Co., Inc. v. Reynolds*, -- U.S. --,  130 S.Ct. 1784, 1796 (2010)(emphasis in original).  This standard requires courts to take into account "plausible opposing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

In the Eleventh Circuit Court of Appeal, scienter may be established if it is demonstrated that Gagliardi acted with "severe recklessness."  *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989); *White v. Sanders,* 689 F.2d 1366, 1367 n.4 (11th Cir.1982); *Broad v. Rockwell International Corp.*, 642 F.2d 929, 961 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965 (1981).  "'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations

that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc)); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985); *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983); *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. denied*, 435 U.S. 952 (1978).  The degree of recklessness in one's disregard for the truth necessary to serve as scienter is extremely high and a district court's express finding that the requisite intent or recklessness was not proved is reviewable only for clear error.  *Securities and Exchange Commission v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 (11th Cir. 1980).  The issue before the Court, therefore, is whether the undisputed evidence, viewed in the light most favorable to Gagliardi, demonstrates that Gagliardi's alleged recklessness was of the magnitude that satisfies the scienter requirement stated above.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

The SEC asserts that it was severely reckless of Gagliardi to recommend securities that he now admits are extremely risky to customers he knew wanted to preserve capital.  The SEC further argues that Gagliardi was severely recklessness because he failed to adequately investigate Program CMOs before he recommended

them to customers.  It was further severely reckless, according to the SEC, for Gagliardi to sell these extremely complex securities without properly understanding them, and in light of the red flag e-mails he got regarding unsuitable investors in the CMO Program.

The SEC, relying on Ninth Circuit precedent, asserts that "Gagliardi's failure to understand and adequately investigate Program CMOs was an extreme departure from the standards of ordinary care to which brokers are held.  *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 857-58 (9th Cir. 2001)."  The SEC argues that "Gagliardi's deviation from these standards of care presented such a clear danger of misleading his CMO Program customers (*i.e.*, was so obvious) that he must have been aware of it."  SEC Reply, DE 175, at 5 of 15.

In this circuit, "a broker owes a duty of full and fair disclosure to a securities investor," as well as "a fiduciary duty of care a loyalty."  *Thompson v. Smith Barney, Harris Upham & Co., Inc.*, 709 F.2d 1413, 1418 (11th Cir. 1983) citing *Dupuy v. Dupuy*, 551 F.2d 1005, 1115 (5th Cir. 1977); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987).  And, "[t]he experience and sophistication of the investor are ... relevant [in determining] the extent of the fiduciary duty of care in explaining contemplated securities transactions."  *Gochnauer*, 810 F.2d at 1049; *see also First Union Brokerage v. Milos*, 997 F.2d 835, 844-45 (11th Cir. 1993).  Moreover, "not every instance of financial unfairness or breach of fiduciary duty will constitute a fraudulent activity under § 10(b) or Rule 10b-5."  *Gochnauer*, 810 F.2d at 1049.

The Court finds that there are plausible opposing inferences that may be made from the evidence that do not lead to the conclusion, as a matter of law, that Gagliardi either knew, or it was so obvious that he must have known, that Program CMOs were inappropriately risky and complex for investors who had preservation of capital as their main objective.  The SEC has offered insufficient evidence to reach this level of culpability as a matter of law.  That Program CMOs did not at the time the transactions were effected have a reasonable basis for achieving conservative investment goals does not meet the standard for scienter.  *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977) citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied,* 419 U.S. 873 (1974).

The fact that Gagliardi admits that he only learned that CMOs are inappropriate investments for risk adverse investors after he saw their price volatility could be seen to suggest that Gagliardi was unaware of this fact previously.  Gagliardi has presented evidence of Brookstreet's forms, training and approach to selling Program CMOs.  In light of this training and approach, it cannot be said, as a matter of law, that it was an extreme departure from the standards of ordinary care for Gagliardi to recommend CMOs as he had been trained.  The SEC has presented no binding case law to show as a matter of law that Gagliardi was severely reckless in not independently researching CMOs.  Gagliardi has presented some evidence (from the NASD) that suggests that the risks associated with CMOs was not clearly

established.  Also, there is no evidence regarding the sophistication of his customers.

Furthermore, Gagliardi has expressed a plausible explanation why he did not see the

e-mails from Brookstreet as red flags.  At this stage of the proceedings, the district

court may not undertake credibility determinations or weigh the evidence.  *State*

*Farm Mut. Auto. Ins. Co. v. Duckworth*, – F.3d –, 2011 WL 3505267, 14 (11th Cir. Aug.

11, 2011) citing  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010).

All of these issues create plausible opposing inferences.

Taking the evidence in the light most favorable to Gagliardi, the Court cannot

conclude that the SEC has adduced sufficient evidence to satisfy the scienter

requirement of severe recklessness.  At most, the SEC has established that some of

Gagliardi's recommendations were not appropriate or reasonable.  Proving he gave

poor advice may lead a jury to find negligence, but it clearly falls short of

demonstrating intent or severe recklessness as defined in this circuit.

**Sections 17(a)(2) and 17(a)(3) of the Securities Act**

While scienter is required to establish violations of § 17(a)(1) of the Securities

Act and § 10(b) and Rule 10b-5 of the Exchange Act, it is not required to establish a

violation of §§ 17(a)(2) or 17(a)(3) of the Securities Act.  A finding of mere negligence

is sufficient.  *Aaron v. SEC,* 446 U.S. 680, 696-702 (1980); *S.E.C. v. Monterosso*, 768 F.

Supp. 2d 1244, 1262 (S.D. Fla. 2011).  The SEC has, however, has not moved for

summary judgment as to Gagliardi's "mere negligence."

Generally, when it comes to negligence, "[s]ummary judgments should be

cautiously granted." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1120 (11th Cir. 2005) quoting *Moore v. Morris*, 475 So.2d 666, 668 (Fla. 1985).  If the inferences that may be drawn from the evidence permit different reasonable inferences, it should be submitted to the jury as a question of fact to be determined by it.  *Id.*  As stated above, this case is one in which the undisputed facts could easily lead to different reasonable inferences.  "[S]ummary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law."  *Id.*; *see also Timson v. Juvenile and Jail Facility Mgmt Serv., Inc.*, 355 Fed. Appx. 283, 285 (11th Cir. 2009).  That is not the case here.  Drawing every possible inference in favor of Gagliardi, conflicting issues of material fact regarding what Gagliardi knew or should have known about Program CMOs are prevalent.  Accordingly, for failing to establish at least one element critical for recovery, it is hereby

      **ORDERED AND ADJUDGED** that the Motion by Plaintiff Securities and Exchange Commission for Summary Judgment Against Troy L. Gagliardi ("Gagliardi") [DE 134] is DENIED.

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 19th day of September, 2011.

                                       _____

                                       KENNETH A. MARRA
                                       United States District Judge

copies to:

All counsel of record
All pro se parties