UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-80803-Civ-MARRA/JOHNSON

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

vs.

WILLIAM BETTA, JR., TRAVIS
A. BRANCH, JAMES J. CAPRIO,
TROY L. GAGLIARDI, RUSSELL
M. KAUTZ, BARRY M. KORNFELD,
SHANE A. MCCANN, CLIFFORD A.
POPPER, ALFRED B. RUBIN, and
STEVEN I. SHRAGO,

      Defendants.

_____/

## ORDER AND OPINION RE: TRAVIS BRANCH

THIS CAUSE is before the Court upon the Motion by Plaintiff Securities and

Exchange Commission for Summary Judgment Against Travis A. Branch [DE 127].  The

Court has carefully considered the motion, response, reply, entire court record, and

is otherwise fully advised in the premises.

## Introduction

The Securities and Exchange Commission ("SEC") brings this action to restrain

and permanently enjoin Troy L. Gagliardi, William Betta, Jr., Travis A. Branch, James

J. Caprio, Russell M. Kautz, Barry M. Kornfeld, Shane A. McCann, Clifford A. Popper,

Alfred B. Rubin, and Steven I. Shrago (collectively, "Defendants") from violating the

antifraud provisions of the federal securities laws.  Compl. ¶ 1.  The SEC seeks a

judgment from the Court: (a) enjoining Defendants from engaging, directly or indirectly, in further violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) ordering Defendants to disgorge, with prejudgment interest, the amount by which they were unjustly enriched as a result of their violations of the federal securities laws; and (c) ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).  Compl. ¶ 6.  The SEC has moved for summary judgment against three of the defendants.  This Opinion addresses the motion for summary judgment against Travis A. Branch ("Branch").  Branch is proceeding *pro se*.

**Undisputed Facts**[1]

Brookstreet Securities Corp. ("Brookstreet") was a broker-dealer and investment adviser with locations nationwide.  It collapsed in June 2007.  Plaintiff Securities and Exchange Commission's Separate Statement of Undisputed Facts Supporting Motion for Summary Judgment Against Defendant Travis A. Branch, DE 129

---

[1] There are three motions for summary judgment against Brookstreet registered representatives under consideration.  All three defendants are proceeding *pro se*.  Because these defendants are not legally trained, the Court accepts all undisputed established facts and applies them to each defendant, whether presented by that defendant or another defendant.  *Fils v. City of Aventura,* – F.3d –, 2011 WL 3241618, *9 (11th Cir. July 28, 2011) ("A district court may look at all the evidence in the record to determine whether issues of material fact exist regarding the plaintiff's asserted causes of action.")

("SEC SUF"), ¶ 1.  From 2004 to 2007, Brookstreet sponsored a program that encouraged its registered representatives to sell collateralized mortgage obligations ("CMOs") to retail customers (the "CMO Program").  DE 136, ¶ 60.  CMOs are mortgage-backed securities that redirect the cash flows from a pool of mortgages among different classes of investors.  Declaration of Dr. John D. Finnerty ("Finnerty Decl."), DE 131, ¶ 3.  Mortgage-backed securities are created by contributing a pool of mortgage loans to a separate legal entity, such as a trust, which issues certificates that entitle holders to receive a portion of the monthly cash flows from the pool of mortgages.  *Id.*  These certificates are usually in the form of tradable securities, which are arranged into several classes.  These CMO classes are prioritized with respect to their right to receive payments of principal and interest coming from the underlying mortgage portfolio.  *Id.*  The simplest mortgage-backed securities structure is the pass-through security, which distributes the cash flows pro rata among the security holders.  As a result, the prepayment risk on the underlying mortgages is also passed straight through to security holders.  *Id.*

Defendant Clifford A. Popper ("Popper") managed the CMO Program through Brookstreet's Institutional Bond Group located in Boca Raton, Florida.  The Institutional Bond Group used seminars at Brookstreet's annual marketing conferences, internal e-mail distributions, and conference calls to encourage Brookstreet's registered representatives, including Defendant Branch, to participate in the CMO Program.  SEC SUF ¶¶ 21, 22.

The CMO Program dealt primarily in three types of CMOs: interest only CMOs ("IOs"); inverse floating rate CMOs ("Inverse Floaters"); and inverse interest only CMOs ("Inverse IOs") (collectively, "Program CMOs").  Program CMOs are among the riskiest types of mortgage derivatives available for trade and are generally not suitable for customers who seek safety of principal.  Finnerty Decl. ¶¶ 6, 10, 12-13. The National Association of Securities Dealers, the industry's self-regulatory organization, issued a notice to its members in 1993 alerting them that IO's and Inverse Floaters were only suitable for sophisticated investors with a high-risk profile. Finnerty Decl. ¶ 17.

**Interest Only CMOs**

Interest Only CMOs, or IOs, are created by separating the interest payment stream and the principal repayment stream from a portfolio of mortgage loans into two classes of CMOs.  Finnerty Decl. ¶ 4.  IOs receive all of the interest but none of the principal.  *Id*.  Instead, their coupon payments are based on a "notional" principal amount.  As the underlying mortgages prepay, the notional principal amount amortizes, and the IO cash flow declines.  IOs are typically sold at deep discounts to their notional amount.  Because there is no principal amount, the IO is said to expire when the underlying mortgages are fully paid and the flow of interest payments stops.  *Id*.

IOs exhibit substantial price volatility as interest rates change.  Finnerty Decl. ¶ 5; Brookstreet Trade Confirmation p. 3 (DE 170).  IOs exhibit much greater price

variability than the underlying portfolio of mortgages from which they were created. Finnerty Decl. ¶ 5. IOs have less liquidity than other CMO classes because there is a limited market for them. *Id.* At Brookstreet, IO liquidity was further diminished because to effect a sale on behalf of a customer holding an odd lot (*i.e.,* small amount, Brookstreet had to find an internal buyer for the odd lot or else aggregate odd lot amounts from several Brookstreet customers into a round lot large enough to sell to a CMO dealer. *Id.*

IOs are unusually risky CMOs and are considered by some market professionals to be among the riskiest of the mortgage securities. Finnerty Decl. ¶ 6. One of the most serious problems with investing in IOs is the way in which their already-volatile price changes can be exaggerated by changes in investor perceptions when interest rates change. Actual price fluctuations may be much more severe than predicted, which can lead to failed hedges. Buyers may abandon IOs when interest rates are falling rapidly because of the sharp expected deterioration in IO prices. IOs are one of the few types of CMOs for which there is a reasonable chance that investors might never recoup their initial investment, even if the investment is held until it expires. *Id.*

## Inverse Floating Rate CMOs

Inverse Floaters are created from a fixed-rate CMO tranche by separating it into two securities. Finnerty Decl. ¶ 7. One is a floating-rate CMO, which is similar to a traditional corporate floating-rate note except for prepayments, and the other is

an Inverse Floater, which is similar to a corporate inverse floating-rate note, except for prepayments.  The fixed-rate CMO tranche can be partitioned in any number of ways but the securities in combination will exhaust the available cash flow that would otherwise be paid to the fixed-payment CMO tranche.  *Id.*

Interest payments on Inverse Floaters vary inversely with an index, such as one of the London Interbank Offer Rates ("LIBOR").  Finnerty Decl. ¶ 8.  Inverse Floaters are typically more leveraged than other CMO tranches.  The coupon rate formula for an Inverse Floater is usually designed to provide what is termed coupon leverage, which occurs when the coupon rate changes based on a multiple of the change in LIBOR.  As the index drops or rises, the coupon rate on the Inverse Floater rises or falls at an accelerated pace, which magnifies the Inverse Floater's price volatility. The greater the coupon leverage, the more the Inverse Floater's coupon rate changes for any given change in LIBOR, and the greater the interest rate sensitivity of the Inverse Floater's price.  *Id*.  Due in part to this volatility, there is a limited market for Inverse Floaters.  Finnerty Decl. ¶ 9.

Inverse Floaters expose investors to concentrated interest rate risk, which can quickly lead to devastating market losses when interest rates rise.  Finnerty Decl. ¶ 10.  Nearly every undesirable characteristic of mortgage securities can be found in concentrated form in many Inverse Floaters.  Finnerty Decl. ¶ 10.  They are very risky but not in a uniform way, which makes them exceptionally difficult to value and manage.  *Id*.

**Inverse Interest Only CMOs**

Inverse IOs combine the interest-only feature of IOs and the inverse-floating-rate structure of Inverse Floaters; they also combine the risk-enhancing features of IOs and Inverse Floaters.  Finnerty Decl. ¶ 11.  Inverse IOs can be created by separating an IO into two securities, one that makes distributions based on a floating-rate formula and the other that makes distributions based on an inverse-floating-rate formula.  *Id*.  As with the underlying IO, because there is no principal amount, Inverse IOs expire when the underlying mortgages are fully paid and the flow of interest payment stops.  *Id*.  Inverse IOs exhibit an unusually wide range of price variability, which makes them a highly speculative investment, and one that is unsuitable for an investor seeking safety of principal.  Finnerty Decl. ¶ 12.

**Margin**

A margin account is an account in which the broker lends the customer cash to purchase securities.  Other securities held by the investor serve as collateral for the loan.  Brookstreet's Trade Confirmations contain the following advisory:

> Utilizing a margin loan for the purchase of CMOs could require an additional deposit (margin call) of funds and/or securities in the event of adverse market conditions.  Failure to meet margin call could result in a liquidation of the securities in the account in order to meet the call.  In addition, the use of a margin loan will amplify the effects of an adverse market environment.  Specifically with regard to margin investing in "Inverse-Floating Rate" CMOs, there is a potential for exacerbation of the inherent risk of loss of equity from investing in these securities as an increase in the market rate of interest would result in, not only a decline of their price which would necessitate a margin call, but also a potential rise in the level of interest being

charged on any margin debit that is owed on the account.

Investing in CMOs is by the instrument's nature speculative.  If you are not comfortable with the aspects of these investments, please withdraw from these instruments immediately by calling your Brookstreet Member or the Brookstreet Client Services Desk at (888) 456-2578 for assistance.

Brookstreet Trade Confirmation, p. 3 (DE 170-1).

**The CMO Program**

CMOs were introduced to Branch and other Brookstreet brokers at their annual conference in approximately the spring of 2004.  At that conference, Clifford Popper and the CMO Program were introduced by Brookstreet President Stan Brooks.  Popper represented to the brokers at the conference that he had extensive experience with government bond money management and that through the purchase of CMOs, he could achieve stable principal and income yielding portfolios for Brookstreet clients. He told the brokers that because of his expertise, he could obtain CMOs for retail investor portfolios at institutional prices and create a balanced portfolio in government guaranteed bonds that produced good income.  Popper stressed that the bonds he would purchase for the CMO Program would have an implied AAA rating because they were backed by the government.  He further represented that he could build a diversified portfolio that provided individual investors stable income and preservation of principal based on the diversification of the holdings.  *See, e.g.,* DE 133-32.  At that time, Popper provided the brokers with written materials which included biographical information about Popper, a description of the CMO Program,

and a document entitled "Institutional Mortgage Backed Bonds, and An Investor's

Guide to Collateralized Mortgage Obligations" ("Investor's Guide").  In describing the

CMO Program, the written materials state, among other things:

> Objectives include capital preservation and high total return.  Balancing the portfolio is achieved by purchasing government agency bonds that benefit from rising rates, falling rates, steepening and flattening yield curves (depending on market circumstances);
>
> Principal is backed by a government agency such as Ginnie Mae, or quasi-government agencies such as Fannie Mae or Freddie Mac;
>
> Both categories of CMOs used in these portfolios generate monthly income and are AAA or implied AAA due to the rating of the underlying collateral;
>
> Used in conjunction with each other and with certain other similar instruments, a high level of return concurrent with capital preservation may be achieved.

*See*, DE 169-5.  The Investor's Guide stated that CMOs offer "regular payments,

relative safety, and notable yield advantages over other fixed-income securities of

comparable credit quality."  DE 169-7 at 3 of 17.

Those Brookstreet registered representatives who wanted to participate in the

CMO Program contacted the Institutional Bond Group to have their customers'

accounts "designated for management."  SEC SUF ¶ 24.  Popper represented and

Brookstreet brokers understood that the CMO Program managed by Popper was an

actively managed account and that it would be adjusted to compensate for outside

forces such as interest rate fluctuations.  DE 133-22 at 5-6.

Each client who decided that they wanted to participate in the CMO Program was required to execute and initial the Brookstreet CMO Disclosure Form.  Among other disclosures, each client acknowledged that:

▸ The primary types of CMOs in my account will be "Inverse Floating Rate" and "Interest Only" CMOs.  In general Inverse Floating Rate CMOs increase in value when interest rates fall and decrease in value when interest rates rise.  Interest Only CMOs increase in value when interest rates rise and decrease in value when interest rates fall.

▸ By selling CMOs rather [than] waiting for the final principal payment, the securities may be worth less than waiting for the final principal payment, and the securities may be worth less than their original face value.

▸ For CMOs purchased at a premium, the guarantee as to principal applies only to the par value of the security and not to any premium paid.

▸ For Interest Only CMOs purchased, if prepayment rates are high, then I may actually receive less cash back than initially invested.

▸ For Inverse Floating Rate CMOs, rising rates will lower interest payments and extend return of principal beyond the anticipated average life.  This may increase or decrease the effective yield.

▸ I have received and read the "Investor's Guide to Collateralized Mortgage Obligations" booklet which was provided to me by my Registered Representative.

DE 133-22 at 7.

The SEC brings this suit against Branch alleging that Branch recommended and sold CMOs to customers even though he knew, or should have known, that the highly risky CMOs he was selling were unsuitable for these customers and he failed to disclose these risks.  Compl. ¶¶ 43-45, 53, 57.

**Branch's Participation in the CMO Program**

Branch was a registered representative in Brookstreet's Honolulu office from February 1995 to June 2007, and was the branch manager for that office.  SEC SUF ¶¶ 1, 9-10.  He held Series 6, 7, 22, 24, and 63 securities licenses.  SEC SUF ¶ 2.  Branch began recommending CMOs to his customers in November of 2004.  Consistent with what he was told, Branch recommended the CMO Program to retirees who sought stability of principal and to investors who did not have a high-risk profile.  SEC SUF ¶¶ 52, 69, 74-76.  He told customers that the underlying mortgages were guaranteed by the federal government.  SEC SUF ¶¶ 63, 78-79.

While Branch knew that Inverse Floaters and IOs were riskier and more volatile than other types of CMOs, he felt they were suitable for his CMO customers because the CMO Program maintained a diversified portfolio of different types of CMOs. Branch told his clients that Popper would create a balanced, hedged CMO portfolio. SEC SUF ¶ 34, 48, 65-67.  Branch had discretionary authority over his clients' accounts.  SEC SUF ¶ 47.  Branch did not analyze the CMOs that Popper bought for his clients' funds; he relied on Popper to decide what was suitable.  SEC SUF ¶¶ 35-37.

In August of 2006, Popper encouraged registered representatives to have their clients invest in CMOs on margin and Branch did so.  SEC SUF ¶¶ 28-29, 64.  When Branch had his customers complete a margin agreement, he explained to his customers that it was a loan against the equity in their portfolio.  SEC SUF ¶ 30.  He did not tell them that it would magnify the risk to their portfolio.  SEC SUF ¶ 77.

Before August of 2006, the only requirement Brookstreet had for customers who were interested in investing in the CMO Program was that they have a minimum of $100,000 to invest.  Later that was raised to $150,000.  SEC SUF ¶ 56.  In August 2006, Kyle Christensen ("Christensen"), Brookstreet's National Branch Compliance Manager, sent an e-mail to Brookstreet's registered representatives, including Branch, regarding CMO Program participant suitability.  SEC SUF ¶ 55.  It stated that investors in the Program must now have a net worth of one million dollars, or a net worth of $500,000 with income of $50,000 or more, **and** the investor's investment objectives must be growth and income at a minimum, but speculation was preferred.  "In other words, the objectives cannot be income or appreciation.  Furthermore, the objective <u>must</u> be speculation if the account has margin."  *See, e.g.,* DE 133-33, 2 of 4 (emphasis in original), SEC SUF ¶ 59.  Attached was a list of CMO Program investors that Brookstreet deemed unqualified per the new guidelines.  SEC SUF ¶ 57.  Representatives were directed to consult with their clients and either put the client on "sell only" status, or, if new information indicated they met the new guidelines, their financial profile or investment objectives were to be updated.  DE 133-33.  Branch considered the list of his unsuitable clients to be "nonsense" because it consisted of high net worth investors who were happy with their investments in the CMO Program.  SEC SUF ¶¶ 58, 62, Branch 1/7/11 Depo. 200-05, DE 163 (Response).

At the time Branch received the August 2006 e-mail from Christensen, his clients, the Osieckis, had not yet invested in CMOs.  SEC SUF ¶ 60.  When the Osieckis

opened a margin account in October of 2006, Branch did not tell them that their

investment objective needed to be speculative if they wanted to invest in CMOs on

margin.  Their account listed their top two investment objectives as capital

appreciation and trading profits.  SEC SUF ¶¶ 61, 70.

Brookstreet stopped operating in June 2007 due to excessive margin calls that

the firm could not cover.  Of Branch's 32 customer accounts, 16 owed Brookstreet's

clearing firm a combined $3.2 million.  Branch earned $482,083 in commissions from

CMO trades between November 2004 and June 2007.  SEC SUF ¶¶ 80, 86, 89.  Branch

currently sells insurance and performs tax consulting services.  SEC SUF ¶ 7.

## STANDARD OF REVIEW

Summary judgment is proper if the record evinces that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A dispute is genuine if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).  A fact is material if it is one that

might affect the outcome of the case.  *See id.*  When a court considers whether or

not to enter summary judgment, it views all of the evidence, and all inferences

drawn therefrom, in the light most favorable to the non-moving party.  *See Hairston*

*v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993).  "It is not the court's

role to weigh conflicting evidence or to make credibility determinations; the

non-movant's evidence is to be accepted for purposes of summary judgment."  *State*

*Farm Mut. Auto. Ins. Co. v. Duckworth*, – F.3d –, 2011 WL 3505267, 14 (11th Cir. Aug. 11, 2011) quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *see also* Fed. R. Civ. P. 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*  In the summary judgment context, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney.  *Loren v. Sasser*, 309 F.3d 1296, 1301 (11th Cir. 2002).

## DISCUSSION

### Section 17(a)(1) of the Securities Act and

### Section 10(b) and Rule 10b-5 of the Exchange Act

Sections 17(a)(1) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) and Rule 10b-5 of the Exchange Act, which proscribe fraudulent conduct in connection with the purchase or sale of securities, both prohibit essentially the same type of practices. *United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979). To establish violations of these antifraud provisions, the SEC must show Branch: (1) made a false statement or omission; (2) that was material; (3) that he acted with scienter; (4) in connection with the purchase or sale of securities; (5) while using the facilities of interstate commerce. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007). The SEC argues that Branch has admitted each of these elements and, therefore, summary judgment is appropriate. Because there are genuine issues of material fact regarding whether Branch acted with scienter, summary judgment will be denied on the SEC's claim that Branch violated §17(a)(1) of the Securities Act and §10(b) and Rule 10b-5 of the Exchange Act. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994) (liability cannot attach when at least one element critical for recovery under 10b-5 is absent); *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001).

**Scienter**

Scienter constitutes an important and necessary element of a § 10(b) securities fraud violation.  In *Ernst & Ernst v. Hochfelder*, the Supreme Court announced that scienter is "a mental state embracing an intent to deceive, manipulate, or defraud." 425 U.S. 185, 193 n.12 (1976).  A plaintiff cannot recover without proving that a defendant made a material misstatement, not merely innocently or negligently, but with *an intent to deceive.  Merck & Co., Inc. v. Reynolds,* -- U.S. --,  130 S.Ct. 1784, 1796 (2010)(emphasis in original).  This standard requires courts to take into account "plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

In the Eleventh Circuit Court of Appeal, scienter may be established if it is demonstrated that Branch acted with "severe recklessness."  *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989); *White v. Sanders,* 689 F.2d 1366, 1367 n.4 (11th Cir. 1982); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965 (1981).  "'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'"  *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th

Cir. 1989) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981)

(en banc)); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir.

1985); *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983); *First Virginia*

*Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. denied*, 435 U.S. 952

(1978).  The degree of recklessness in one's disregard for the truth necessary to serve

as scienter is extremely high and a district court's express finding that the requisite

intent or recklessness was not proved is reviewable only for clear error.  *Securities*

*and Exchange Commission v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 (11th

Cir. 1980).  The issue before the Court, therefore, is whether the undisputed

evidence, viewed in the light most favorable to Branch, demonstrates that Branch's

alleged recklessness was of the magnitude that satisfies the scienter requirement

stated above.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir.

1993).

  The SEC asserts that it was not merely negligent, but severely reckless of

Branch to:

  &#9656; tell his customers that Program CMOs were relatively safe investments when he knew that Inverse Floaters and IOs were more volatile and more risky than other CMOs;

  &#9656; tout Program CMOs as a low-risk investment appropriate for retirees in light of publicly available information that Program CMOs were only suitable for investors who had a high risk profile;

  &#9656; rely on Popper to decide what was suitable for his clients even though Branch did not know whether Popper had access to information about his customer's investment objectives;

> ▸ authorize trades when he did not analyze each of the CMOs that were bought for his customers' accounts to determine whether the particular investments were suitable for their portfolios;

> ▸ brush off as "nonsense" the notice he got that the Program was not suitable for many of his customers;

> ▸ persuade the Osieckis to begin investing in CMOs on margin without telling them that investing on margin would magnify the risk to their portfolio.

DE 128 at 11-12.

Of the three Defendants against whom the SEC has sought summary judgment, Branch is the Defendant the SEC has come closest to establishing liability as a matter of law. However, the Court still finds that there are plausible opposing inferences that may be made from the evidence that do not lead to the conclusion, as a matter of law, that Branch's actions or inactions were an extreme departure from the standards of ordinary care, or that it was so obvious that he should have known that Program CMOs were inappropriately risky and complex for investors who had preservation of capital as their main objective. The SEC has offered insufficient evidence to reach this level of culpability as a matter of law. The fact that Program CMOs did not, at the time the transactions were effected, have a reasonable basis for achieving conservative investment goals does not meet the standard for scienter. *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977) citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974).

While Branch has not made any effort to comply with Fed. R. Civ. P. 56(c) and has not submitted anything pursuant to the Notice of Summary Judgment, he is a *pro se* litigant.  Moreover, the record in this case includes Brookstreet's forms, training and approach to selling Program CMOs, and evidence about how Brookstreet and Popper directed the CMO program relative to its brokers.  In light of this training and approach, it cannot be said, as a matter of law, that it was an extreme departure from the standards of ordinary care for Branch to recommend CMOs as he had been trained.  The SEC has presented no binding case law to show as a matter of law that Branch was severely reckless in not independently researching CMOs or Popper's credentials.  At this stage of the proceedings, the district court may not undertake credibility determinations or weigh the evidence.  *State Farm Mut. Auto. Ins. Co. v. Duckworth*, – F.3d –, 2011 WL 3505267, 14 (11th Cir. Aug. 11, 2011) citing  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010).  All of these issues create plausible opposing inferences.

Taking the evidence in the light most favorable to Branch, the Court cannot conclude that the SEC has adduced sufficient evidence to satisfy the scienter requirement of severe recklessness.  At most, the SEC has established that some of Branch's recommendations were not appropriate or reasonable.  Proving he gave poor advice may lead a jury to find negligence, but it clearly falls short of demonstrating intent or severe recklessness as defined in this circuit.

## Sections 17(a)(2) and 17(a)(3) of the Securities Act

While scienter is required to establish violations of § 17(a)(1) of the Securities

Act and § 10(b) and Rule 10b-5 of the Exchange Act, it is not required to establish a violation of §§ 17(a)(2) or 17(a)(3) of the Securities Act.  A finding of mere negligence is sufficient.  *Aaron v. SEC,* 446 U.S. 680, 696-702 (1980); *S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1262 (S.D. Fla. 2011).  The SEC has, however, has not moved for summary judgment as to Branch's "mere negligence."

Generally, when it comes to negligence, "[s]ummary judgments should be cautiously granted."  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1120 (11th Cir. 2005) quoting *Moore v. Morris*, 475 So.2d 666, 668 (Fla. 1985).  If the inferences that may be drawn from the evidence permit different reasonable inferences, it should be submitted to the jury as a question of fact to be determined by it.  *Id.*  As stated above, this case is one in which the undisputed facts could easily lead to different reasonable inferences.  "[S]ummary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law."  *Id.; see also Timson v. Juvenile and Jail Facility Mgmt Serv., Inc.*, 355 Fed. Appx. 283, 285 (11th Cir. 2009).  That is not the case here.  Drawing every possible inference in favor of Branch, conflicting issues of material fact regarding what Branch knew or should have known about Program CMOs are prevalent.  Accordingly, for failing to establish at least one element critical for recovery, it is hereby

**ORDERED AND ADJUDGED** that the Motion by Plaintiff Securities and Exchange

Commission for Summary Judgment Against Travis A. Branch [DE 127] is DENIED.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 19th day of September, 2011.

KENNETH A. MARRA
United States District Judge

copies to:
All counsel of record
All pro se parties